[No. 81687-5.   En Banc.]
Argued September 15, 2009.     Decided July 14, 2011.

*In the Matter of the Detention of* D.F.F.[†]

---

[†] The initials D.F.F. are used in place of respondent's name because this matter concerns her involuntary commitment proceedings.

*Robert M. McKenna*, *Attorney General*, *Anne E. Egeler*, *Deputy Solicitor General*, and *Robert A. Antanaitis*, *Assistant*, for petitioner.

*Nancy P. Collins* (of *Washington Appellate Project*), for respondent.

*Richard B. Levenson* on behalf of Cascade Mental Health, Central Washington Comprehensive Mental Health, and Behavior Health Resources, amici curiae.

*Michele Lynn Earl-Hubbard*, *David Norman*, and *Christopher Roslaniec* on behalf of Allied Daily Newspapers of Washington, Washington Newspaper Publishers Association, and Washington Coalition for Open Government, amici curiae.

¶1 SANDERS, J.[*] — We are asked to decide whether Superior Court Mental Proceedings Rules (MPR) 1.3, which provides involuntary commitment proceedings "shall not be open to the public, unless the person who is the subject of the proceedings or his attorney files with the court a written request that the proceedings be public," violates the right to open administration of justice under article I, section 10 of the Washington Constitution. As a preliminary issue, we must first determine whether respondent D.F.F. has standing to challenge MPR 1.3 under article I, section 10.

---

[*] Justice Richard Sanders is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

## FACTS AND PROCEDURAL HISTORY

¶2 Respondent D.F.F. was involuntarily committed for psychiatric treatment under chapter 71.05 RCW. The trial judge closed her proceedings to the public as a matter of course pursuant to MPR 1.3.

¶3 D.F.F. challenged her commitment on appeal, arguing mandatory closure under MPR 1.3 violated her rights under article I, section 10's open administration of justice. The Court of Appeals held MPR 1.3 was unconstitutional, reversed D.F.F.'s commitment order, and remanded for further proceedings. *See In re Det. of D.F.F.*, 144 Wn. App. 214, 226-27, 183 P.3d 302 (2008).[1] We granted the State's petition for review. 164 Wn.2d 1034, 197 P.3d 1185 (2008).

## ANALYSIS

### I. Standing

¶4 We first address whether D.F.F. has rights under article I, section 10, which afford her standing to challenge the constitutionality of MPR 1.3. Article I, section 10 pronounces, "Justice in all cases shall be administered openly . . . ." The State does not dispute that D.F.F. has rights under article I, section 10 as a member of the public. But the State argues that open justice under article I, section 10 merely protects her right to attend her own commitment proceedings, and thus there was no violation since she did attend her own commitment proceedings. The State reasons D.F.F. has no standing to claim a violation based upon the *general public's* inability to attend.

¶5 The State misconstrues and minimizes D.F.F.'s rights under article I, section 10. Our constitution mandates that

---

[1] D.F.F. also argued the State failed to prove essential elements to support commitment. Because the Court of Appeals reversed D.F.F.'s commitment order on constitutional grounds, it did not reach that issue. *D.F.F.*, 144 Wn. App. at 227 n.8. Nor do we.

"[j]ustice in all cases shall be administered openly . . . ." CONST. art. I, § 10. The open administration of justice assures the structural fairness of the proceedings, affirms their legitimacy, and promotes confidence in the judiciary. *See State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009); *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 812, 100 P.3d 291 (2004). D.F.F. is a member of the public and the target of a civil action to involuntarily confine her.[2] Article I, section 10 provides for her right as a member of the public to attend the proceedings, *but also* her individual right to have the proceedings open to the observation and scrutiny of the general public. This court observed in *John Doe v. Puget Sound Blood Center*, 117 Wn.2d 772, 780-81, 819 P.2d 370 (1991), that open justice under article I, section 10 "is not an abstract theory of constitutional law, but rather is the bedrock foundation upon which rest all the people's rights and obligations. In the course of administering justice the courts protect those rights and enforce those obligations. Indeed, the very first enactment of our state constitution is the declaration that governments are established to protect and maintain individual rights. Const. art. 1, § 1. Const. art. 1, §§ 1-31 catalog those fundamental rights of our citizens." The public monitors the fairness of the proceedings and the appropriateness of the result—and article I, section 10 grants D.F.F. the right to demand that protection. *See Momah*, 167 Wn.2d at 148.[3] D.F.F. also has a right to open proceedings to permit family, friends, and other interested individuals to be present at the proceed-

---

[2] "[C]ommitment is a deprivation of liberty. It is incarceration against one's will, whether it is called 'criminal' or 'civil.' " *In re Application of Gault*, 387 U.S. 1, 50, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967).

[3] "[T]he requirement of a public trial is primarily for the benefit of the accused: that the public may see he is fairly dealt with and not unjustly condemned and that the presence of interested spectators may keep his triers keenly alive to a sense of the responsibility and to the importance of their functions." *Momah*, 167 Wn.2d at 148.

ings.[4] *See Orange*, 152 Wn.2d at 812. Not only can those individuals monitor the case and publicly disseminate information about it, but also they may possess specialized or personal knowledge that they can provide to assist D.F.F. If D.F.F.'s rights under article I, section 10 are limited to assuring her presence at her own proceedings, she is robbed of any of the actual benefits of the open administration of justice. D.F.F. has standing to assert an open administration of justice challenge under article I, section 10 based upon the exclusion of the general public from her commitment proceedings.

II. Constitutionality of MPR 1.3

■ ¶6 The constitutionality of a court rule is a question of law. We review questions of law de novo. *State v. Robinson*, 153 Wn.2d 689, 693, 107 P.3d 90 (2005). We now consider whether MPR 1.3 is unconstitutional in light of article I, section 10. We hold that it is unconstitutional. This court has clearly and consistently held that the open administration of justice is a vital constitutional safeguard and, although not without exception, such an exception is appropriate only under the most unusual circumstances and must satisfy the five requirements as set forth in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 38-39, 640 P.2d 716 (1982), and elsewhere, *see, e.g., Momah*, 167 Wn.2d at 149; *State v. Bone-Club*, 128 Wn.2d 254, 258-59, 906 P.2d 325 (1995).[5] Since the open administration of justice as-

---

[4] Family, friends, and interested individuals can also individually assert their rights under article I, section 10 as members of the public. However, the full scope of D.F.F.'s article I, section 10 protections are not contingent on those individuals doing so, as the State's argument entails. As a practical matter, family, friends, and other interested individuals may wish to attend but be unwilling to assert their legal right to do so—whether due to their unfamiliarity with their rights, a lack of time or money to invest in doing so, or a desire not to be formally involved.

[5] The five requirements are:

"1. The proponent of closure . . . must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

sures the structural fairness of proceedings, a court's failure to consider whether a closure is necessary is a structural error. MPR 1.3 automatically closes the proceedings from the public without requiring or even permitting the trial court to make its constitutionally mandated determination whether those five requirements are met. Thus, the procedure set forth in MPR 1.3 violates article I, section 10.

¶7 As a remedy for violation of her article I, section 10 rights, D.F.F. seeks new, open proceedings. This is an appropriate remedy because courtroom closures affect the very integrity of a proceeding, regardless of whether the complaining party can show prejudice. *State v. Easterling*, 157 Wn.2d 167, 181, 137 P.3d 825 (2006); *accord Waller v. Georgia*, 467 U.S. 39, 49, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984). In this vein, we have recognized in criminal cases that a courtroom closure bears the hallmarks of structural error. *See Momah*, 167 Wn.2d at 149 (in the context of a criminal trial, "[a]n error is structural when it 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'" (second alteration in original) (internal quotation marks omitted) (quoting *Washington v. Recuenco*, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006))).

¶8 In *Momah* we listed some of the hallmarks of closures resulting in structural errors:

[(1)] the trial court closed the courtroom based on interests other than the defendant's; [(2)] the closures impacted the fairness of the defendant's proceedings; [(3)] the court closed the courtroom without seeking objection, input, or assent from

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Momah*, 167 Wn.2d at 149 (emphasis omitted) (alterations in original) (internal quotation marks omitted) (quoting *Bone-Club*, 128 Wn.2d at 258-59).

the defendant; and [(4)] the record lacked any hint that the trial court considered the defendant's right to a public trial when it closed the courtroom.

*Id.* at 151.

¶9 Here, all four hallmarks exist. The first, third, and fourth are evident: (1) the trial court closed the courtroom based upon the mandate in MPR 1.3, without considering the interests involved; (3) the court sought no input from D.F.F. concerning the closure; and (4) there is nothing in the record to indicate the trial court considered D.F.F.'s right to the open administration of justice.

¶10 The second hallmark questions whether the closure impacted the fairness of D.F.F.'s proceeding. *See id.* at 151. Article I, section 10 protects more than merely a given individual's right to personally attend a trial or proceedings. It protects D.F.F.'s right to have the proceedings open to the watchful eye of the public, to permit the public to scrutinize the proceedings. Such open access to the courts assures the structural fairness of the proceedings and affirms their legitimacy. It is fundamental to the operation and legitimacy of the courts and protection of all other rights and liberties. "Prejudice is necessarily presumed where a violation of the public trial right occurs." *Easterling*, 157 Wn.2d at 181. Since the "benefits of a public trial are frequently intangible, difficult to prove, or a matter of chance," though "nonetheless real," a defendant is not required to prove specific prejudice to obtain relief for a public trial violation. *Waller*, 467 U.S. at 49, 50 n.9.

¶11 The closure of D.F.F.'s proceedings satisfies all the *Momah* hallmarks for a structural error. Structural error entitles D.F.F. to new commitment proceedings.[6]

---

[6] The dissent cites to a Ninth Circuit Court of Appeals case, *M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634 (9th Cir. 2004), for the proposition that a structural error analysis is inapplicable in a civil context. Dissent at 53. We note that this split opinion is not dispositive on the issue, nor do we rely on the Ninth Circuit to determine state law issues. Several state courts have found structural error in a civil context. *See Perkins v. Komarnyckyj*, 172 Ariz. 115, 116-20, 834 P.2d 1260

¶12 This is not the first case where this court has granted a new trial when a trial court closed proceedings without considering the five requirements to permit an exception to the open administration of justice right under article I, section 10 or the right to a public trial under article I, section 22. *See Easterling*, 157 Wn.2d at 171 ("We conclude that the trial court committed an error of constitutional magnitude when it directed that the courtroom be fully closed to Easterling and to the public during the joint trial without first satisfying the requirements set forth in [*Bone-Club*, 128 Wn.2d at 258-59]. The trial court's failure to engage in the required case-by-case weighing of the competing interests prior to directing the courtroom be closed rendered unfair all subsequent trial proceedings."); *State v. Brightman*, 155 Wn.2d 506, 509, 122 P.3d 150 (2005) ("[T]he trial court erred when it directed that the courtroom would be closed to spectators during jury selection, without fulfilling the requirements set forth in [*Bone-Club*]. This error entitles Brightman to a new trial.").[7] This

---

(1992) (applying structural error analysis to procedural error in civil trial); *In re Marriage of Carlsson*, 163 Cal. App. 4th 281, 293, 77 Cal.Rptr. 3d 305 (2008) ("failure to accord a party litigant his constitutional right to due process is reversible per se, and not subject to the harmless error doctrine"); *Lakeside Regent, Inc. v. FDIC*, 660 So. 2d 368, 370 (Fla. Dist. Ct. App. 1995) (applying structural error analysis to denial of discovery of "necessary, properly discoverable material" in a civil trial); *Canterino v. Mirage Casino-Hotel*, 118 Nev. 191, 194, 42 P.3d 808 (2002) (trial judge's ex parte communication with jurors was inherently prejudicial and no further showing was needed to require reversal); *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 88, 209 P.3d 200 (2009) (applying structural error analysis to denial of due process right to attend trial in parental rights termination proceeding); *Duffy v. Vogel*, 12 N.Y.3d 169, 177, 905 N.E.2d 1175, 878 N.Y.S.2d 246 (2009) (trial court's failure to poll jury, an entitlement closely enmeshed with and protective of the right to trial by jury, defied harmless error analysis); *McGarry v. Horlacher*, 2002 Ohio 3161, 149 Ohio App. 3d 33, 41, 775 N.E.2d 865 (applying a "structural error" analysis in a civil context finding plaintiff was actually prejudiced as a result of having few peremptory challenges to exercise and it was not necessary to find plaintiff's substantial rights were affected); *Sandford v. Chevrolet Div. of Gen. Motors*, 292 Or. 590, 614, 642 P.2d 624 (1982) (finding that trial court's failure to poll the jury defied harmless error analysis); *In re Termination of Parental Rights to Torrance P.*, 2006 WI 129, 298 Wis. 2d 1, 28, 724 N.W.2d 623 (applying structural error analysis to denial of the statutory right to counsel in parental right termination proceeding).

[7] Our holding here remains true to our holding in *Easterling*, where we refused to adopt a de minimis exception to the open administration of justice, which would

result should be of little surprise. The open administration of justice is fundamental to the operation and legitimacy of the courts and to the protections of all other rights and liberties.[8] *See Easterling*, 157 Wn.2d at 187 (Chambers, J., concurring) (The open administration of justice "is a constitutional obligation of the courts. It is integral to our system of government."). The jurisdiction of the courts may be set forth on paper, but the authority of the courts—like every other branch of government—is derived from the people. The ability to imprison or involuntarily confine a citizen is an awesome power and, as such, is always at risk to be abused—with devastating results. It is a historic trend that continues in many parts of the world today that individuals who disagree with the powers-that-be are labeled mentally ill and their voices are silenced through involuntarily confinement. But the ratifiers of our constitution guaranteed better. The guaranty of open administration of justice is at the very heart of the fairness and legitimacy of judicial proceedings. The public bears witness and scrutinizes the proceedings, assuring they are fair and proper, and that any deprivation of liberty is justified. Through this, citizens are guaranteed the strongest protection against unfair or unlawful confinement by the government—the protection

---

have permitted violation of article I, section 10 if the court determined the defendant suffered only trivial harm from the constitutional violation. 157 Wn.2d at 180 (Alexander, C.J.), 186-87 (Chambers, J., concurring). There we held that since a trial court is required by the constitution to apply the *Bone-Club* guidelines, a court would never have occasion to determine whether a constitutional violation was de minimis. Rather, the only question for appeal is whether the closure was justified based upon the trial court's application of the constitutional guidelines. *Id.* at 180 n.12. An outright failure to apply the constitutional guidelines cannot justify a closure.

[8] So fundamental is this protection to a system of justice and a free society that the Washington Constitution provides for it generally in article I, section 10 and again for criminal prosecutions in article I, section 22. Through either source, "the public trial right operates as an essential cog in the constitutional design of fair trial safeguards." *Bone-Club*, 128 Wn.2d at 259. Article I, sections 10 and 22 assure that this cog is always in operation. *See id.* (Sections 10 and 22 "serve complementary and interdependent functions in assuring the fairness of our judicial system."). A person is no more subject to involuntary confinement by way of a closed civil trial than he or she is subject to imprisonment by way of a closed criminal trial.

afforded because the public is watching. D.F.F. is entitled to that protection. D.F.F. is entitled to new commitment proceedings.

¶13 The dissent would hold, even though D.F.F. was involuntarily confined after closed commitment proceedings that violated the open administration of justice under article I, section 10, she is not entitled to new proceedings. The dissent reasons because D.F.F.'s rights under article I, section 10 are those of a member of the public, she is, at most, entitled to a transcript of her involuntary confinement proceedings due to the constitutional violation. Dissent at 49, 50. The dissent severely understates the protections afforded by article I, section 10 and ultimately suggests a remedy that provides D.F.F. no remedy at all. As discussed throughout, article I, section 10 is D.F.F.'s fundamental assurance that her proceedings are observed, scrutinized, and *legitimized* through administration open to the public.

¶14 Were we to follow the dissent's interpretation of article I, section 10, citizens would be afforded no actual protection. If the individual facing involuntary confinement were present at the hearing, he or she would have no enforceable right under article I, section 10 to demand the public's presence. Nor, indeed, would the public. If either complained, the trial court could "remedy" the flagrantly unconstitutional, nonpublic hearing by providing the complaining party with a transcript of the proceeding.

¶15 But providing a transcript does not fully address the effects of the courtroom closure. Article I, section 10 recognizes that holding court proceedings in the open is core to the integrity of those proceedings. A fundamentally different brand of justice is administered when courts are open and the parties, witnesses, and judge all conduct their affairs in the light of day. Providing a transcript of a closed proceeding falls far short of guaranteeing open justice. Where, as here, D.F.F. was unconstitutionally deprived of her right to have her proceedings conducted in open court,

her remedy is not limited to receiving a transcript of a closed proceeding. Rather, it is appropriate here to grant her a new commitment proceeding, where she can be assured of the legitimacy and fairness flowing from public scrutiny, as guaranteed by article I, section 10.

## CONCLUSION

¶16 We affirm the Court of Appeals decision. MPR 1.3 automatically closes involuntary confinement proceedings to the public without requiring the court to make the constitutionally mandated determination whether closure is permissible under article I, section 10. We hold MPR 1.3 is unconstitutional. We reverse D.F.F.'s commitment order and remand for new commitment proceedings.

ALEXANDER, OWENS, and STEPHENS, JJ., concur.

¶17 J.M. JOHNSON, J. (concurring in the result only) — I concur only in the result of the lead opinion. I write separately to avoid blurring important distinctions between the rights protected by the provisions of article I, sections 10 and 22 of the state constitution.

¶18 Superior Court Mental Proceedings Rule (MPR) 1.3 violates article I, section 10 of the state constitution. Both the lead opinion and the dissenting opinion agree on this point. *See* lead opinion at 47 ("We hold MPR 1.3 is unconstitutional."); dissent at 49 ("I agree with the general proposition that [MPR] 1.3 runs afoul of article I, section 10 of the Washington State Constitution."). Like my colleagues, I too recognize the constitutional invalidity of MPR 1.3.

¶19 *Allied Daily Newspapers of Washington v. Eikenberry*, 121 Wn.2d 205, 848 P.2d 1258 (1993) controls the present case. In *Allied Daily Newspapers*, the legislature passed a statute requiring courts to ensure that information identifying child victims of sexual assault was not disclosed

to the public during the course of trial or in court records. *Id.* at 207. We held that the legislation at issue violated article I, section 10. *Id.* at 214. In doing so, we noted that our past precedents required case-by-case analysis pursuant to the five factors expanded and articulated in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982). *Allied Daily Newspapers*, 121 Wn.2d at 210-11.

¶20 MPR 1.3 presumes closure. However, we held in *Allied Daily Newspapers* that legislation that "does not permit . . . individualized determinations, is not in accordance with the *Ishikawa* guidelines, and is therefore unconstitutional." *Id.* at 211. The constitutional presumption for courtroom proceedings is openness. Legislation that presumes closure violates the people's constitutional commitment that "[j]ustice in all cases shall be administered openly" in the Washington courts. WASH. CONST. art. I, § 10.

¶21 Even though the lead opinion arrives at the right result, I cannot concur in its use of precedent. As the dissenting opinion correctly points out, the lead opinion frequently invokes *criminal* cases discussing the rights of *criminal defendants* pursuant to article I, section 22. These cases do not involve interpretation of the same constitutional provision or the same interests. Our use of the same five factor analysis to review courtroom closures under article I, sections 10 and 22[9] does not suggest that these constitutional provisions are interchangeable.

¶22 Lastly, the lead opinion and the dissenting opinion disagree regarding the appropriate remedy. I agree with the dissent that "structural error" analysis does not apply to the civil context. However, D.F.F., as a respondent committed after a closed hearing, demonstrates sufficient prejudice to warrant relief. Further, I agree with the lead opinion that the release of a transcript to D.F.F. is clearly not a sufficient remedy. Reversal of the commitment order and

---

[9] *See State v. Bone-Club*, 128 Wn.2d 254, 259, 906 P.2d 325 (1995) (importing five factor analysis from article I, section 10 cases to the article I, section 22 context).

remand for new proceedings is the appropriate remedy based on the record in this case.

CONCLUSION

¶23 Despite some flawed reasoning, the lead opinion correctly determines that MPR 1.3 is unconstitutional and reverses D.F.F.'s commitment order. I concur in this result alone.

CHAMBERS, J., concurs with J.M. JOHNSON, J.

¶24 MADSEN, C.J. (dissenting) — I agree with the general proposition that Superior Court Mental Proceedings Rule (MPR) 1.3 runs afoul of article I, section 10 of the Washington State Constitution. However, I do not believe the appropriate remedy in this case is a new trial.

¶25 The harm resulting from the closure of D.F.F.'s commitment hearing fell not to D.F.F. but to the absent public. Because D.F.F. declined to exercise her explicit right under MPR 1.3 to request an open trial, she cannot demand a new trial on grounds that the ensuing closure violated her own article I, section 10 rights.

¶26 Nor can she seek a new trial on behalf of the public. Assuming D.F.F. had standing to assert the rights of excluded members of the public, the appropriate remedy for aggrieved members of the public following an article I, section 10 violation is the release of transcripts—not a new trial.

¶27 The lead opinion provides no legal basis for righting a wrong inflicted on the public by providing a new trial to an uninjured, individual litigant. Instead, the lead opinion obscures this incongruity by unapologetically importing criminal law to the civil context and conflating two distinct provisions of the Washington Constitution: article I, section 10, which ensures the open administration of justice, and

article I, section 22, which protects a criminal defendant's right to a public trial. In so doing, the lead opinion misinterprets our case law and sets dangerous precedent. Because it is incumbent on this court to provide guidance to trial courts by clarifying our increasingly muddled section 10 and section 22 jurisprudence, I respectfully dissent.

## Discussion

¶28 MPR 1.3 posed no hindrance to D.F.F.'s ability to obtain an open hearing; under the terms of this rule, she had every opportunity to request one. *See* MPR 1.3 ("Proceedings had pursuant to RCW 71.05 shall not be open to the public, unless the person who is the subject of the proceedings or his attorney files with the court a written request that the proceedings be public."). Presumably, had the actual closure been detrimental to D.F.F.'s interests, she or her attorney would have requested an open hearing. In short, D.F.F. may not have it both ways; having elected a closed commitment hearing, she may not challenge this closure on appeal in hopes of obtaining a more favorable result. In holding otherwise, the lead opinion departs from long-standing principles of fairness and finality by permitting a litigant two bites of the proverbial apple.

¶29 In contrast, members of the public who were excluded from D.F.F.'s commitment hearing suffered a veritable constitutional injury; MPR 1.3 provides no means for members of the public to request an open courtroom. However, assuming D.F.F. has standing to assert the section 10 rights of absent members of the public, I would hold that the public is entitled only to the release of transcripts from the closed commitment hearing—not a new trial.

¶30 The public's interest in the open administration of justice is by no means insignificant. "Openness of courts is essential to the courts' ability to maintain public confidence in the fairness and honesty of the judicial branch of government as being the ultimate protector of liberty, property,

and constitutional integrity." *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 211, 848 P.2d 1258 (1993). However, the lead opinion misconceives the nature of this harm. The public interest in open courts lies not in the outcome but rather in the transparency of commitment hearings. A member of the general public has no legally cognizable interest in the outcome of a suit to which she is not a party and therefore no grounds to seek reversal and a new trial. Accordingly, a new commitment hearing would do no more to advance the public interest in "freely observ[ing] the administration of . . . justice" than the release of transcripts from the closed proceedings. *Id.*

¶31 Providing a transcript of closed proceedings fully vindicates the public interest in open courts. *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 512-13, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (requiring release of transcripts to remedy unlawful closure and holding that where limited closure is necessary, "the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time"); *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 45-46, 640 P.2d 716 (1982) (remanding to trial court with instructions to reconsider the denial of a motion by two daily newspapers to release the transcripts of a closed hearing); *Cohen v. Everett City Council*, 85 Wn.2d 385, 390, 535 P.2d 801 (1975) (requiring release of transcripts where newspaper challenged closed proceedings). Such a remedy gives teeth to section 10 by serving as a deterrent. When courts are aware that the public is entitled to the transcripts of closed proceedings, any incentive to conduct such proceedings behind closed doors disappears. Similarly, it is difficult to imagine a scenario in which a court that is compelled to release transcripts could conceal them nevertheless. Thus, for these purposes, reading a transcript is the functional equivalent of attending a court proceeding in person.

¶32 In concluding that the closure of D.F.F.'s commitment hearing amounted to structural error and, conse-

quently, that D.F.F. is entitled to a new trial, the lead opinion relies without explanation on criminal cases and on article I, section 22. *See* lead opinion at 40 (citing *State v. Momah*, 167 Wn.2d 140, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010); *In re. Pers. Restraint Petition of Orange*, 152 Wn.2d 795, 100 P.3d 291 (2004); *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995); *State v. Easterling*, 157 Wn.2d 167, 137 P.3d 825 (2006); *State v. Brightman*, 155 Wn.2d 506, 122 P.3d 150 (2005); *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)). Perhaps attempting to blur these critical distinctions, the lead opinion highlights the parallels between civil commitment proceedings and criminal proceedings. Lead opinion at 40 n.2 (" '[C]ommitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil" ' " (alteration in original) (quoting *In re Application of Gault*, 387 U.S. 1, 50, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967))). However, these similarities do not render civil commitment proceedings criminal in nature, nor do they render section 22 applicable in the civil context. In short, because it rests exclusively on inapplicable case law, the lead opinion's remedy analysis is fundamentally flawed.

¶33 Until now, our section 22 jurisprudence has been relatively settled as to the proper remedy for an unlawful closure in the criminal context. Where closure amounts to a structural error—an error that " 'necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence' "—a criminal defendant is entitled to automatic reversal and a new trial. *Momah*, 167 Wn.2d at 149 (alteration in original) (internal quotation marks omitted) (quoting *Recuenco*, 548 U.S. at 218-19). Less settled, however, is the proper remedy for open courts violations in the civil context, where section 22 does not apply. Without explanation, the lead opinion extrapolates from the criminal context to conclude that structural error analysis governs civil commitment proceedings. However,

both precedent and common sense suggest that structural error analysis is ill suited for the section 10 context.

¶34 First, structural error analysis has no place in the civil arena. In fact, structural error is defined with reference to criminal trials. According to the United States Supreme Court, structural errors "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.'" *Neder v. United States*, 527 U.S. 1, 8-9, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999) (alteration in original) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986)).[10]

¶35 Not surprisingly, in *M.L. v. Federal Way School District*, 394 F.3d 634 (9th Cir. 2004), a majority of the three-judge panel held that structural error analysis was inapplicable in the civil context. In particular, Judge Gould, who was joined by Judge Clifton in rejecting the use of structural error analysis, criticized Judge Alarcon for "extrapolat[ing] from the criminal context" in applying structural error analysis. *Id.* at 653 (Gould, J., concurring); *see id.* at 658 (Clifton, J., dissenting). He went on to "find this structural error analysis strikingly inapplicable in our civil case context" and noted that Judge Alarcon "cite[d] no precedent applying structural error in civil cases in our circuit." *Id.* at 653-54 (Gould, J., concurring).[11]

---

[10] Indeed, the lead opinion expressly acknowledges that the definition of structural error on which it relies is limited to the criminal context. Lead opinion at 42 ("*in the context of a criminal trial*, '[a]n error is structural when it necessarily render[s] a *criminal trial* fundamentally unfair or an unreliable vehicle for determining guilt or innocence'" (emphasis added) (alterations in original) (some internal quotation marks omitted) (quoting *Recuenco*, 548 U.S. at 218-19)). The lead opinion fails to explain when and why structural error analysis applies outside the context of a criminal trial in Washington State.

[11] The lead opinion notes that on occasion, state courts have engaged in structural error analysis in the civil context. Lead opinion at 43 n.6. However, among the long list of cases the lead opinion cites in support of this proposition, few provide clear examples of structural error analysis. Furthermore, none of these cases explains or attempts to explain why structural error analysis,

¶36 Because article I, section 22 is inapplicable in the civil context, and because the harm resulting from the closure of D.F.F.'s commitment hearing fell not to D.F.F. but to the public at large, I would look to our article I, section 10 jurisprudence—not our section 22 jurisprudence—to determine the appropriate remedy in this case. While we have not yet addressed the remedy for a section 10 violation in the context of a civil commitment proceeding, our case law is instructive nevertheless.

¶37 In *Ishikawa*, 97 Wn.2d at 32-33, the trial court ordered the closure of a pretrial hearing in a murder case upon the joint motion of the defendant and the prosecuting attorney. Relying on section 10 and the First Amendment, the Seattle Times newspaper objected, but the hearing was conducted in closed session and the transcripts from the hearing sealed. *Id.* at 33. After the hearing, the Seattle Times moved to have the transcripts released, but the court denied the motion. *Id.* Trial proceeded, and the defendant was convicted of murder in the first degree. *Id.* Following the verdict, the Seattle Times renewed its motion for release of the transcripts, which was again denied. *Id.* After setting forth the standard to be followed in restricting access to the public, this court remanded to the trial court to reconsider the request to unseal the transcript of the closed hearing. *Id.* at 37-46. Notably, the court did not order a new hearing. *Id.*

¶38 *Cohen* is similar. There, the Everett City Council initiated a proceeding to revoke a city license of a sauna parlor operator. *Cohen*, 85 Wn.2d at 386. The licensee sought judicial review of the council decision, and a transcript of the city council proceedings was filed in superior court. *Id.* The licensee obtained an order of confidentiality, which sealed the record pending a hearing on the merits. *Id.* The Everett Herald intervened to address whether the "trial" on the merits would be open or in camera and

premised on the constitutional right of a criminal defendant to a fair trial, applies in the civil context.

whether the evidence, including the transcript, would continue to be sealed. *Id.* After the trial court reviewed the sealed transcript and issued a decision on the merits against the licensee, it continued to withhold the transcript from the public, and the Everett Herald moved to set aside the continuing confidentiality order. *Id.* at 387. Citing to section 10, this court reversed the trial court's confidentiality order and ordered the release of the transcript. In so doing, we noted that

> [t]he trial court's review of the proceedings of the city council's action was a review of the transcript of those proceedings. . . . [I]n essence that record was the equivalent of testimony. . . . In the usual case, testimony cannot be taken in or kept secret. Once the court reached the merits of the controversy, the testimony—transcript—had to be part of the public record.

¶39 *Id.* at 389. Importantly, we did not reverse the trial court's decision on the merits, despite the confidentiality order that had shrouded the decision-making process in secrecy. *Id.* at 390. Instead, the sole remedy we provided to the "public" was the release of the transcript well after the fact. *Id.*

¶40 In each of these cases, we held that the proper remedy for a section 10 violation was the release of transcripts, not a new trial or reconsideration on the merits. Indeed, I have found no case in which this court has ordered a new trial to remedy an open courts violation in the civil context.[12] D.F.F. provides no basis for departing from precedent here.

---

[12] Once again conflating section 10 and section 22, the lead opinion contends that "[t]his is not the first case where this court has granted a new trial when a trial court closed proceedings without considering the five requirements to permit an exception to the open administration of justice right under article I, section 10 or the right to a public trial under article I, section 22." Lead opinion at 44. However, the lead opinion then goes on to cite two criminal cases, *Easterling* and *Brightman*, both of which rest, at least in part, on the right to a public trial guaranteed in section 22. Lead opinion at 44 (citing *Easterling*, 157 Wn.2d at 171; *Brightman*, 155 Wn.2d at 509). The lead opinion cites no case in which a court has

¶41 While a new commitment hearing will not advance the section 10 interests of the public, it may prove highly advantageous to D.F.F.—and consequently, prejudicial to the State—by allowing D.F.F. to proceed under an entirely different set of circumstances.[13] More broadly, today's holding will allow civil litigants who suffer no harm from closure—and indeed, who may have benefited from closure—to seek new trials nevertheless by asserting the rights of the public at large. *Cf. State v. Strode*, 167 Wn.2d 222, 236, 217 P.3d 310 (2009) (Fairhurst, J., concurring) ("I do not agree with [the lead opinion's] conflation of the rights of the defendant, the media, and the public. A defendant should not be able to assert the right of the public or the press in order to overturn his conviction when his own right to a public trial has been safeguarded as required under *Bone-Club* or has been waived.").

¶42 By the same token, today's opinion raises the specter of nonparties rejecting final judgments and demanding new trials pursuant to section 10, even where the actual litigants have no objection to closure and no desire to relitigate their claims and defenses. Here, the lead opinion held that an individual challenging the closure of her own commitment hearing was entitled to a new trial. However, by failing to distinguish between remedies available to individual litigants and those available to members of the

---

granted a new trial on the basis of a section 10 violation without a concomitant section 22 claim.

[13] While D.F.F. already has completed 90 days of civil commitment pursuant to the original commitment order, a new hearing at this time would allow her to challenge both the initial determination that gave rise to the civil commitment order and the collateral consequences that stemmed from that order, such as her continuing inability to possess a firearm. *See In re Det. of D.F.F.*, 144 Wn. App. 214, 219 n.2, 183 P.3d 302 (2008). Because a civil commitment hearing is highly fact-intensive and based on frequently shifting factual circumstances, a new commitment hearing conducted years after the initial hearing may have serious accuracy problems. In particular, it may be impossible for one or both parties to present the same evidence that existed at the time of the initial hearing. To the extent that the resulting inaccuracies will benefit D.F.F., they will prejudice the State, which must overcome a heavy burden to prevail in a commitment hearing and which relies on civil commitment and its collateral consequences to protect mental health consumers and the public. *See generally* RCW 71.05.010 et seq.

public, the lead opinion implies that the appropriate remedy for *all* section 10 violations is a new trial. Under the lead opinion's reasoning, anyone challenging the closure of D.F.F.'s commitment hearing would be entitled a new trial. Thus, carried to its logical conclusion, today's holding offends basic principles of fairness and runs counter to deeply held interests in finality and judicial economy.

¶43 In sum, granting a new commitment hearing to D.F.F. to remedy an injury to the public at large comports neither with case law nor common sense, and it sets dangerous precedent. I respectfully dissent.

C. JOHNSON and FAIRHURST, JJ., concur with MADSEN, C.J.