[Nos. 67022-1-I; 67023-9-I;   Division One.   June 11, 2012.]
67024-7-I; 67025-5-I;
67026-3-I; 67027-1-I.

*In the Matter of the Dependency of* J.A.F. ET AL.

MARTA TUCKER ET AL., *Appellants*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Jan Trasen* (of *Washington Appellate Project*) and *Casey Grannis* (of *Nielsen, Broman & Koch PLLC*), for appellants.

*Robert M. McKenna, Attorney General,* and *Michael S. Majors, Senior Counsel,* for respondent.

¶1 LEACH, C.J. — Michael Fleming and Marta Tucker appeal orders terminating their parental rights to their three children, V.F., J.F., and E.F. Both assert that the trial court violated article I, section 10 of the Washington State Constitution by closing a portion of the termination trial to the public. Because they did not raise this issue in the trial court and do not show actual prejudice, they cannot assert it now. Fleming and Tucker also raise issues regarding notice requirements under the Indian Child Welfare Act of 1978[1] and the trial court's findings that continuation of the parent-child relationship would diminish prospects for early integration into a stable and permanent home and that termination is in the children's best interests. Because these other claims lack merit, we affirm.

## FACTS

¶2 Fleming and Tucker are the biological parents of V.F., born February 2, 1998, and twins E.F. and J.F., born July 25, 2001. Each of the children exhibits challenging behavior, requiring skilled parenting.[2] When the Department of Social and Health Services (DSHS) became involved with the family in 2008, it discovered unsafe living conditions, a lack of parental control, substance abuse by Fleming, and a lack

---

[1] 25 U.S.C. §§ 1901-1963.

[2] Examples include tantrums, biting, hitting, and screaming. Additionally, V.F. has been diagnosed with attention deficit and hyperactivity disorder, anxiety disorder, and some elements of post-traumatic stress disorder. E.F. has been diagnosed with reactive attachment disorder and oppositional defiant disorder. J.F. has been diagnosed with disruptive behavior disorder not otherwise specified and is severely developmentally delayed. She has an IQ (intelligence quotient) of 58 and therefore the cognitive abilities of a child much younger than her biological age.

of parenting skills on the part of both parents. After the parents failed to participate voluntarily in remedial services, DSHS filed dependency petitions for each of the children. V.F., E.F., and J.F. were removed from their parents' custody on December 5, 2008, and on February 11, 2009, the trial court entered agreed orders of dependency. These orders noted that Tucker and Fleming admitted to the following parental deficiencies: (1) Fleming's alcoholism interferes with his ability to parent; (2) conditions at the family's house are unsafe and unsanitary; and (3) "[t]he parents are unable to adequately intervene or discipline the children's behavior, including fighting and bedwetting." The parents also admitted that the children possibly suffer from "mental health issues."

¶3 The court ordered Fleming to complete a drug and alcohol evaluation and undergo random urinalysis testing. The court required Tucker to submit to a psychological evaluation and attend individual and family counseling. Both parents were ordered to participate in parenting classes, coaching, and education and to "obtain and maintain a safe, stable, drug/alcohol/violence free living environment appropriate for a child." The court also provided the parents with two supervised visits per week.

¶4 In a permanency planning review order entered in October 2009, the trial court stated that Fleming and Tucker had complied with the court-ordered services. The court provided for further parenting instruction and approved a primary plan of adoption with an alternative plan of returning the children to the care of Fleming and Tucker. At a review hearing in February 2010, the court found (1) the parents would not gain any benefit from additional parenting classes because they were "either unwilling or unable to independently apply the skills taught"; (2) "[t]he current visitation schedule is not working, . . . has a detrimental impact on the children[, and r]eports of recent visitation continue to be extreme in that some visits are really good, and other visits are real disasters"; and (3)

"[c]ontinuing the current situation of visitation will result in more damage to the children." As a result, the court reduced the parents' visitation schedule to two supervised visits per month. At a full review hearing in April 2010, the State reported that Tucker had not engaged in any mental health counseling and that Fleming had relapsed and was drinking again. The court found that Fleming and Tucker had made no progress to correct their parental deficiencies.

¶5 In June 2010, DSHS filed a termination petition for each of the children. After a nine-day trial in January and February 2011, during which the court heard testimony from Fleming, Tucker, the social worker, the parents' psychological evaluators, the visit supervisors, the guardian ad litem, and the children's therapists, the trial court entered orders terminating Tucker's and Fleming's parental rights as to each child. The trial court made specific findings, including the following disputed findings:

2.2     There is no reason to know that the child is an Indian child as defined in 25 U.S.C. [§] 1903(4), and the Indian Child Welfare Act does not apply to these proceedings.

. . . .

2.118   Child's Early Integration: Continuation of the parent-child relationship clearly diminishes the child's prospect for early integration into a stable and permanent home.

. . . .

2.120   [J.F.] has been in different foster care placements since she was at Ryther Child Center, but she also needs to have some stability and permanence which cannot occur when she has ongoing visitation with her parents.

. . . .

2.125   [The guardian ad litem] testified that in her opinion it would be in the best interests of all the children to terminate the parental rights. The Court agrees with that opinion. It is overwhelmingly supported by the other evidence in this case.

. . . .

2.134    Best Interest of the Child: It is in the best interest of the child that all of the parental rights of Marta Lucia Tucker and Michael Glenn Fleming be terminated under RCW 13.34.180 and .190.

Fleming and Tucker appeal.

## ANALYSIS

*The Public's Right to Open Proceedings*

■ ¶6  For the first time on appeal, Fleming and Tucker contend that the trial court committed constitutional error under article I, section 10 of the Washington Constitution and the First Amendment to the United States Constitution by closing the proceedings to the public during the testimony of Susan Harris, clinical director of Phoenix Recovery Center. Generally, a party asserting a constitutional error for the first time on appeal must show that the alleged error actually affected that party's rights at trial.[3] Because Fleming and Tucker do not make this showing, we decline to review this issue.

¶7  DSHS called Harris to testify about Fleming's attendance at a Phoenix inpatient alcohol rehabilitation program. Before Harris testified, however, DSHS told the trial court that Harris believed federal law required a court order before she disclosed information about Fleming's treatment. DSHS requested an order authorizing disclosure under 42 C.F.R. § 2.64.[4] After considering DSHS's application, the trial court ordered Harris to testify. All parties agreed that federal law required the trial court to close Harris's testimony to the public. The trial court stated,

I'm going to hereby order that the courtroom be closed at this point, and I don't think the clerk needs to post the sign

---

[3] RAP 2.5(a)(3); *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007).

[4] 42 C.F.R. § 2.64 outlines the procedures and criteria for orders authorizing disclosures from alcohol and drug abuse patient records for noncriminal purposes.

because . . . all those present are authorized to be here and should anybody else enter the courtroom, I'll direct that that person depart. So we are now in a closed hearing under the law.

¶8 Harris testified over two days. Before her testimony resumed on the second day, the trial court again asked if anyone objected to the closed proceeding. No one did. The trial court noted,

One of the reasons I'm taking these statements explicitly on the record here is that I would like to avoid any situation where there is some objection raised at some later time in this case that the testimony of Ms. Harris should have been taken in open court or something of that nature.

Tucker's attorney stated, "I think [Tucker would] actually prefer the whole trial be closed, so I don't think there's any issue at all." The trial court's written order requiring Harris to testify stated, "[T]he courtroom shall be closed to the public during any such testimony, and only the parties, the judge and necessary court personnel shall be present." The court sealed that part of the transcript containing Harris's testimony. At no point during these proceedings did anyone mention the public's constitutional right to open proceedings under article I, section 10.[5]

¶9 Article I, section 10 provides that "[j]ustice in all cases shall be administered openly, and without unnecessary delay." This provision guarantees the public open access to judicial proceedings and court documents in both civil and criminal cases.[6] Similarly, the First Amendment "preserves a right of access to court proceedings and re-

---

[5] The trial court said it was "mindful" of GR 15, the rule that "sets forth a uniform procedure for the destruction, sealing, and redaction of court records." GR 15(a). In deciding whether to destroy, seal, or redact court records under GR 15, a trial court must also consider the public's right to open proceedings by applying and weighing the factors set forth in *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 37-39, 640 P.2d 716 (1982). *Indigo Real Estate Servs. v. Rousey*, 151 Wn. App. 941, 948, 215 P.3d 977 (2009). Although aware of GR 15, the trial court believed it had "no alternative" but to follow the federal law requirement.

[6] *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004).

cords."[7] However, the public's access to judicial proceedings may be limited if the trial court determines that closure is appropriate after applying and weighing the five factors set forth in *Seattle Times Co. v. Ishikawa*.[8] In addition to considering these factors on the record, the trial court must enter specific findings justifying its closure order.[9] We review claims based on article I, section 10 de novo.[10]

¶10 Although neither party objected to the closure below, RAP 2.5(a)(3) allows a party to raise for the first time on appeal a manifest error affecting this constitutional right.[11] To demonstrate that an asserted error is manifest, the

---

[7] *Tacoma News, Inc. v. Cayce*, 172 Wn.2d 58, 65, 256 P.3d 1179 (2011).

[8] 97 Wn.2d 30, 640 P.2d 716 (1982). The factors are:

1. The proponent of closure and/or sealing must make some showing of the need therefor. In demonstrating that need, the movant should state the interests or rights which give rise to that need as specifically as possible without endangering those interests.

... If closure and/or sealing is sought to further any right or interest besides the defendant's right to a fair trial, a "serious and imminent threat to some other important interest" must be shown.

. . . .

2. "Anyone present when the closure [and/or sealing] motion is made must be given an opportunity to object to the [suggested restriction]."

. . . .

3. The court, the proponents and the objectors should carefully analyze whether the requested method for curtailing access would be both the least restrictive means available and effective in protecting the interests threatened. . . . If the endangered interests do not include the defendant's Sixth Amendment rights, that burden rests with the proponents.

4. "The court must weigh the competing interests of the defendant and the public," and consider the alternative methods suggested. Its consideration of these issues should be articulated in its findings and conclusions, which should be as specific as possible rather than conclusory.

5. "The order must be no broader in its application or duration than necessary to serve its purpose. . . ." If the order involves sealing of records, it shall apply for a specific time period with a burden on the proponent to come before the court at a time specified to justify continued sealing.

*Ishikawa*, 97 Wn.2d at 37-39 (some alterations in original) (citations omitted) (quoting *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 62, 64, 615 P.2d 440 (1980)).

[9] *Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 510, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984).

[10] *In re Det. of Ticeson*, 159 Wn. App. 374, 379, 246 P.3d 550 (2011).

[11] *Ticeson*, 159 Wn. App. at 382-83.

appellant must show actual prejudice[12]—which means " 'the asserted error had practical and identifiable consequences in the trial of the case.' "[13]

¶11 Fleming and Tucker have demonstrated a violation of article I, section 10. The trial court closed part of the proceedings without first applying the *Ishikawa* factors. The court did not weigh Fleming's interest in the privacy of his drug treatment records against the public's interest in open and accessible courts. Nor did the court articulate findings justifying the closure. Because the court closed the courtroom without properly considering the public's right to open and public proceedings, Tucker and Fleming establish a constitutional error.[14]

¶12 Because Tucker and Fleming assert this error for the first time on appeal, they must also demonstrate that the error had identifiable and practical consequences in their trial.[15] Tucker and Fleming have not done so. Tucker asserts, "Public trial errors, by nature, resist that analysis." And Fleming relies on the presumption of prejudice enjoyed by defendants asserting article I, section 22 violations. "This does not satisfy the rule."[16] Additionally, the appellants conceded at oral argument that they cannot demonstrate prejudice. We agree with that concession. During the closed proceedings, Harris testified about Fleming's participation in inpatient services to treat his alcoholism. But the facts elicited from Harris were independently established by other evidence in portions of the proceedings that were open to the public. Therefore, Tucker and Fleming cannot

[12] *Kirkman*, 159 Wn.2d at 935.

[13] *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (internal quotation marks omitted) (quoting *Kirkman*, 159 Wn.2d at 935).

[14] DSHS attempts to do the required analysis in its briefing to this court. But the determination of a compelling interest is the affirmative duty of the trial court. *State v. Bone-Club*, 128 Wn.2d 254, 261, 906 P.2d 325 (1995). This court will not make that determination on appeal.

[15] RAP 2.5; *Ticeson*, 159 Wn. App. at 383.

[16] *Ticeson*, 159 Wn. App. at 383.

show that Harris's testimony alone affected the outcome of the trial. By failing to object below and by failing to demonstrate actual prejudice on appeal, Fleming and Tucker waived review.

¶13 Tucker claims that our Supreme Court's plurality decision in *In re Detention of D.F.F.*[17] requires us to reverse the termination order. Because a majority of the court agreed that a violation of the public's article I, section 10 rights is not structural error, we disagree. In *D.F.F.*, our Supreme Court held that MPR 1.3, which required automatic closure of involuntary commitment proceedings, violated article I, section 10.[18] The court made this holding unanimously. But the court divided over the proper remedy and the justification for that remedy. The lead opinion, signed by four justices, held that the article I, section 10 violation was a structural error entitling D.F.F. to new commitment proceedings regardless of whether she could show prejudice.[19] The concurrence, signed by two justices, concluded that D.F.F. was entitled to this relief because she had demonstrated sufficient prejudice.[20] The dissent, signed by three justices, concluded that D.F.F. was not entitled to a new proceeding because the harm caused by the closure did not fall on her.[21] The concurrence and dissent agreed that " 'structural error' analysis does not apply to the civil context."[22] Therefore, a majority of the court agreed that a party seeking a new hearing for a violation of the public's article I, section 10 rights must show actual prejudice.

---

[17] 172 Wn.2d 37, 256 P.3d 357 (2011).

[18] *D.F.F.*, 172 Wn.2d at 41.

[19] *D.F.F.*, 172 Wn.2d at 42-43 (Sanders, J., lead opinion).

[20] *D.F.F.*, 172 Wn.2d at 48 (J.M. Johnson, J., concurring). The concurrence disapproves of the lead opinion's reliance on criminal cases discussing the rights of criminal defendants under article I, section 22.

[21] *D.F.F.*, 172 Wn.2d at 49 (Madsen, C.J., dissenting).

[22] *D.F.F.*, 172 Wn.2d at 48 (J.M. Johnson, J., concurring).

¶14 Again, neither appellant here has made this required showing. Therefore, they are not entitled to relief from the trial court's constitutional error under *D.F.F.*

■ ¶15 Fleming and Tucker also argue that they did not knowingly, voluntarily, and intelligently waive their rights, citing our decision in *State v. Applegate*.[23] "In criminal cases, the court must ensure that any waiver of Section 22 rights is knowing, intelligent, and voluntary—which means the court must be sure the defendant knew he possessed such a right and knowingly waived it."[24] This test does not apply when assessing whether a party has waived its own right to assert the public's article I, section 10 rights.[25] *Applegate* is inapposite.

¶16 Fleming and Tucker have demonstrated constitutional error, but they have not demonstrated actual prejudice as required by RAP 2.5. Therefore, they have waived the error and may not raise it for the first time on appeal.

## *Indian Child Welfare Act of 1978 (ICWA)*

¶17 Both parents assert that DSHS failed to follow ICWA's notice procedures, which require the State to alert the appropriate tribe and, in some cases, the Bureau of Indian Affairs (BIA) when a dependency proceeding involves an "Indian child." In September 2008, Tucker informed DSHS that she had Cherokee ancestry. DSHS notified the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee, the Eastern Band of Cherokee, and the BIA that the pending action possibly involved "Indian children." The notice sent to the BIA did not identify an affiliation with a particular tribe. Each tribe responded that it did not consider the children to be "Indian children." The BIA responded, "The child was determined to

---

[23] 163 Wn. App. 460, 470, 259 P.3d 311 (2011), *petition for review filed*, No. 86513-2 (Wash. Sept. 23, 2011).

[24] *Ticeson*, 159 Wn. App. at 383.

[25] *Ticeson*, 159 Wn. App. at 383.

be non-Indian by Superior Court: therefore the Indian Child Welfare Act of 1978 does not apply. Do *not* send future notices."

¶18 On the first day of the termination trial, Tucker informed the trial court that her great-great-grandmother was possibly a member of the "Barefoot" Tribe.[26] When the trial court asked her whether she meant the "Blackfoot" Tribe, Tucker reiterated that she believed it was "Barefoot."[27] During her testimony, the State asked Tucker why she had earlier indicated Cherokee ancestry. Tucker responded, "I said Indian ancestry. I wasn't sure 'cause my dad said Barefoot. It could be Blackfoot. It could be almost anything. It was on my dad's side." DSHS contacted Tucker's father, Gail Woods. Woods told DSHS "he knew he had 'Indian blood' but did not know anything more than that." Woods could not identify a specific tribe, although he thought the tribe might be "somewhere in Wisconsin." Woods said he did not know of another family member who would have more information. DSHS did not send any further notices to tribes or to the BIA.

¶19 The ICWA applies to any involuntary child custody proceeding involving an "Indian child." The statute defines "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."[28] Under the ICWA, an interested tribe must receive notice of a state court parental rights termination proceeding if the court "knows or has reason to know that an Indian child is involved."[29] If a tribe's precise identity or location cannot be

---

[26] A "Barefoot" tribe is not among the federally recognized tribes listed in the *Federal Register*. 75 Fed. Reg. 60,810 (Oct. 1, 2010).

[27] The Blackfeet Tribe is a federally recognized tribe in Montana. 75 Fed. Reg. 60,810 (Oct. 1, 2010).

[28] 25 U.S.C. § 1903(4).

[29] 25 U.S.C. § 1912(a).

determined, notice must be given to the secretary of the interior.[30] Notice is mandatory regardless of how late in the proceedings the issue arises.[31] Failure to provide proper notice or to allow a tribe to intervene constitutes grounds to invalidate the termination proceeding.[32] If a tribe is not federally recognized, ICWA's notice requirements do not apply.[33]

¶20  Division Two's decision *In re Welfare of L.N.B.-L.*[34] is instructive. There, the father described his heritage as " 'Cherokee and Black Foot out of the Algonquin Nation,' "[35] although he was not a member of those tribes. The court determined that the record contained insufficient evidence to determine whether the father's "Black Foot" ancestry referred to the Blackfeet Tribe in Montana.[36] Because DSHS failed to notify the Cherokee and "Black Foot" tribes, the court remanded for proper notice. Division Two, however, stated that because the identity of the "Black Foot" tribe was unclear, DSHS "should, on remand, notify the Portland area director of the Bureau of Indian Affairs (BIA) of the termination orders."[37]

■ ¶21  On this record, DSHS gave proper notice under the ICWA. Because a federally recognized tribe could not be identified from Tucker's testimony and DSHS's investigation, the proper action under the ICWA would be to send a notice to the BIA. DSHS, however, already notified the BIA of the termination action, and the BIA responded that V.F., E.F., and J.F. were not "Indian children." Because the State

---

[30] 25 U.S.C. § 1912(a).

[31] *In re Dependency of T.L.G.*, 126 Wn. App. 181, 187 n.8, 108 P.3d 156 (2005).

[32] 25 U.S.C. § 1914; *T.L.G.*, 126 Wn. App. at 192-93.

[33] *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 238, 237 P.3d 944 (2010).

[34] 157 Wn. App. 215, 237 P.3d 944 (2010).

[35] *L.N.B.-L.*, 157 Wn. App. at 225.

[36] *L.N.B.-L.*, 157 Wn. App. at 238 n.20.

[37] *L.N.B.-L.*, 157 Wn. App. at 238 n.20.

notified the BIA, it fulfilled its obligation under the ICWA. We therefore reject this claim.

*Termination of Parent-Child Relationship*

¶22 Tucker asserts that DSHS failed to prove by clear, cogent, and convincing evidence that continuation of the parent-child relationship diminished J.F.'s prospects for early integration into a stable and permanent home. Parental rights are a fundamental liberty interest protected by the United States Constitution.[38] In order to terminate a parent's rights, the State must establish six statutory factors by clear, cogent, and convincing evidence, including that "continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home."[39] Clear, cogent, and convincing evidence exists when the ultimate fact at issue is shown to be " 'highly probable.' "[40] This court will not disturb the trial court's findings if they are supported by substantial evidence.[41] The trial court's unchallenged findings are verities on appeal.[42] If the court finds that the State has met its burden under RCW 13.34.180, it may order termination if it also finds by a preponderance of the evidence that termination is in the children's best interests.[43]

---

[38] *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

[39] RCW 13.34.180(1)(f), .190(1)(a).

[40] *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (internal quotation marks omitted) (quoting *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)).

[41] *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). "Substantial evidence" is " 'evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.' " *World Wide Video, Inc. v. City of Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991) (quoting *Bering v. Share*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986)).

[42] *In re Dependency of J.M.R.*, 160 Wn. App. 929, 939 n.5, 249 P.3d 193 (2011).

[43] RCW 13.34.190(2); *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228-29, 896 P.2d 1298 (1995).

¶23 Although parental rights receive constitutional protection, a parent does not have an absolute right to the custody and care of a child. The paramount consideration in a termination proceeding is the child's welfare.[44] Where a child's rights conflict with the parent's legal rights, the child's rights prevail.[45] A child's right to basic nurturing includes the right to a safe, stable, and permanent home.[46]

■ ■ ¶24 Here, Tucker challenges the trial court's finding under RCW 13.34.180(1)(f) only as to J.F., arguing that because J.F. was not in an adoptive placement at the time of termination, a continued relationship with Tucker would not diminish her prospects for early integration.[47] We disagree.

> [T]he main focus of the sixth allegation in RCW 13.34.180 is the parent-child relationship and whether it impedes the child's prospects for integration, not what constitutes a stable and permanent home. The State does not have to prove that a stable and permanent home is available at the time of termination.[48]

Therefore, the fact that J.F. has not yet been placed in a prospective adoptive home has no bearing on whether substantial evidence supports the trial court's finding.

¶25 The record here supports the trial court's determination that continuing a legal relationship with Tucker will prevent J.F.'s integration into a stable and permanent home. The undisputed findings confirm that J.F. has significant problems requiring safety, structure, and stability in her living environment, that J.F. decompensated and regressed during visits with her parents, that Tucker does not possess the necessary skills to keep her children safe,

---

[44] *In re Welfare of Young*, 24 Wn. App. 392, 395, 600 P.2d 1312 (1979).

[45] RCW 13.34.020.

[46] RCW 13.34.020; *In re Welfare of H.S.*, 94 Wn. App. 511, 530, 973 P.2d 474 (1999); *In re Dependency of C.R.B.*, 62 Wn. App. 608, 615, 814 P.2d 1197 (1991).

[47] At the time the trial court entered its termination order, E.F. and V.F. were in prospective adoptive families.

[48] *In re Dependency of K.S.C.*, 137 Wn.2d 918, 927, 976 P.2d 113 (1999).

that Tucker's mental health issues render her incapable of parenting, and that it is unlikely that Tucker will ever be able to parent effectively. In short, the undisputed findings demonstrate that a continued relationship with her mother will harm J.F.

¶26 Tucker relies on *In re Welfare of S.V.B.*[49] for the proposition that continuation of the parent-child relationship does not diminish a child's prospects for early integration into a stable and permanent home if it would not cause a change in the existing care-taking arrangements for the child. But unlike the placement here, the child there was in an existing guardianship with the grandmother, a relationship that " 'rises to the level of permanency.' "[50] Because *S.V.B.* involved both a guardianship and an existing permanent relationship, we find it inapposite.

¶27 Tucker argues that the trial court's finding reads "early" out of the statute. But "[t]he statute does not indicate that the State must seek approval of a permanent placement at the time of termination. [The statute] refers to the parent-child relationship diminishing the child's 'prospects' of a stable and permanent home, not to certainty of such placement."[51] Because DSHS does not need to demonstrate the certainty of placement, Tucker's argument fails. The trial court did not err by finding that J.F.'s continuing relationship with Tucker would diminish her prospects for early integration into a stable and permanent home.

*Children's Best Interests*

¶28 Fleming disputes the trial court's finding that termination is in the children's best interests because he and the children are "bonded." This court affords a trial

[49] 75 Wn. App. 762, 775, 880 P.2d 80 (1994).

[50] *In re Dependency of A.C.*, 123 Wn. App. 244, 253, 98 P.3d 89 (2004) (quoting *CASA (Court Appointed Special Advocate) v. Dep't of Servs. for Children, Youth & Their Families, Div. of Family Servs.*, 834 A.2d 63, 66 (Del. 2003)).

[51] *K.S.C.*, 137 Wn.2d at 928-29.

court broad discretion in making the "best interests" determination, and its decision receives great deference on review.[52] Whether termination is in a child's best interests must be decided on the facts and circumstances of each case.[53] When a parent has failed to rehabilitate over a lengthy dependency period, a court is fully justified in finding termination to be in a child's best interests rather than leaving the child " 'in the limbo of foster care for an indefinite period' " while the parent seeks further rehabilitation.[54]

¶29 To support his argument, Fleming cites the testimony of Joey Warner, a case manager who supervised some of the visits between Fleming and his children. Warner stated that while Tucker generally had trouble interacting with her children, "It was primarily the dad who had the very positive portions of the visits. He was able to interact, gave hugs, smiled, gave praise to the children, interacted very well." Warner also testified that during one of the visits, E.F. disclosed to her parents that she had been sexually abused by Tucker's nephew. Tucker did not respond to the disclosure. Fleming, on the other hand, "did very, very well. He praised her. He rubbed his arm down her back. You know, comforted her. Interacted extremely well to the situation."

¶30 While this testimony demonstrates that Fleming possesses some positive parenting skills, the preponderance of the evidence nevertheless supports the trial court's best interests finding. The court's unchallenged findings show that Fleming is an alcoholic, whose problems with substance abuse prevent him from parenting his children. Fleming does not dispute the trial court's findings that his ongoing substance abuse prevents him from meeting his

[52] *Young*, 24 Wn. App. at 395.

[53] *In re Dependency of A.V.D.*, 62 Wn. App. 562, 572, 815 P.2d 277 (1991).

[54] *In re Dependency of T.R.*, 108 Wn. App. 149, 167, 29 P.3d 1275 (2001) (quoting *In re A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988)).

children's needs for permanence and stability, renders him incapable of providing proper care for his children, and places his children in imminent risk of harm. Therefore, those findings are verities on appeal. Additionally, Fleming acknowledged during his testimony that he was unfit to parent because of his continued dependence on alcohol. The trial court did not err by finding that termination of Fleming's parental rights is in the best interests of his children.

## CONCLUSION

¶31 Tucker and Fleming cannot raise their article I, section 10 claims on appeal, and their additional claims have no merit. We affirm.

GROSSE and ELLINGTON, JJ., concur.