FILED
COURT OF APPEALS
DIVISION II

2014 AUG 12 PM 12: 49

STATE OF WASHINGTON

BY_____
DEPUTY

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Welfare of: | No. 45304-5-II<br>Consolidated with No. 45310-0-II |
| K.J.R. and K.K.R.<br><br>Minor children. | UNPUBLISHED OPINION |

HUNT, J. — TM[1] appeals the juvenile court's order terminating her parental rights to her two daughters, KKR and KJR. TM argues that the juvenile court (1) violated her due process rights by proceeding with the first day of the termination hearing without her being present, (2) erred in finding there was little likelihood that she would remedy her parental deficiencies because the State failed to produce clear, cogent, and convincing evidence, and (3) erred in ruling that termination of her parental rights was in the children's best interests. We affirm.

## FACTS

### I. BACKGROUND

#### A. Dependency Petitions

KJR (born October 2005) and KKR (born February 2007) are the children of TM and PR. TM's other daughter, KC, is not involved in this appeal.[2] Washington's Department of Social and Health Services (Department) received notice that TM's doctor was concerned because she had been intoxicated at her appointment when she was 20 weeks pregnant. In January 2006,

---

[1] To provide some confidentiality, we use the juveniles' and their family's initials in the case caption and in the body of this opinion.

[2] TM had moved with KC from Oregon to Washington in 2005, while pregnant with KJR.

soon after KJR was born, the Department placed KJR and KC in foster care and filed a dependency petition against both PR and TM based on their drug and alcohol use and household domestic violence. In May 2006, the Department established dependency for KJR and KC. Between 2006 and 2007, the Department case manager, Janell Tschosik, worked with TM and PR on committing to participate in services, such as couples counseling, domestic violence and anger management counseling, and substance abuse treatment.

When KKR was born in February 2007, the hospital called the Department because of concerns that TM was not working with the hospital staff to breast feed her new baby. Later, the hospital called the Department to report that TM had begun cooperating. The Department then filed an in-home dependency for newborn KKR.

Around November 2007, TM was convicted of disorderly conduct toward PR, which led to placement of the three girls with PR. Because PR was not KC's biological father, he asked not to care for her; and the Department put her in foster care.[3]

In July 2008, the Department (1) dismissed KJR's dependency because she appeared to have been living safely with PR for over six months, and (2) returned KC to TM on condition that TM comply with court orders for KC's care and supervision. Shortly thereafter, TM, intoxicated, was arrested for a domestic violence incident with PR. The juvenile court returned KC to foster care; KJR and KKR stayed with PR, who obtained a restraining order against TM. Despite the restraining order, on December 31, PR and TM, both intoxicated, engaged in a physical dispute in front of their children; PR was arrested and incarcerated on felony charges. After PR's arrest, KJR and KKR resided with TM.

---

[3] Eventually, the Department worked to place KC with her biological father, DC.

In January 2009, the Department filed another dependency petition as to KKR and KJR. The juvenile court placed KKR and KJR in foster care, with specific orders for TM to complete domestic violence classes, to participate in counseling with her therapist, to participate in substance abuse treatment, and to submit to random urinary analyses (UA). In February, TM entered a 30-day inpatient treatment for her drug and alcohol issues. In March, she entered family treatment court a specialized court that works with participants to treat substance abuse problems.

On April 6, the family treatment court sanctioned TM because she had missed an appointment with her domestic violence treatment group, which she was required to attend daily for two weeks. On April 13, the family treatment court again sanctioned TM, this time for failing to turn in her meeting slips and for missing another treatment group. On April 20, the family treatment court sanctioned TM for two "stabilization violation[s]"[4]—two positive UAs for drugs and alcohol. 1 Verbatim Report of Proceedings (VRP) at 69. On April 27, the family treatment court again sanctioned TM for a positive UA after she reported drinking alcohol. On May 11, the family treatment court imposed multiple sanctions against TM for missing her UAs, for failing to turn in her meeting slips, for failing to complete her prior sanctions, for not showing up in court, and for being incarcerated: TM was required to perform two days of community service at the "Road to Recovery,"[5] to attend daily support group meetings, to check

---

[4] Instead of directly sanctioning parents who have violated terms of family treatment court, the court puts them through a "stabilization phase," which includes UAs to test for drugs and alcohol. 1 Verbatim Report of Proceedings at 69.

[5] 1 VRP at 70.

into housing resources, to identify an anchor group, and to meet with the Lifeline Connections[6] case manager. Subsequently, the family treatment court again sanctioned TM for a positive UA and a missed treatment visit.

In June, the juvenile court held a dependency review hearing and ordered KKR and KJR to remain in foster care.[7] At this point, TM was homeless, had missed her substance abuse treatment support group meetings, and had tested positive for "ETG" (marijuana) on April 13. Ex. 18. From June through October, the family treatment court sanctioned TM again for missing treatment visits and for low creatinine levels in her UAs.[8]

TM completed her domestic violence treatment in January 2010. In March, she began taking classes through Clark College, was working part-time, and violated her curfew at the shelter where she lived. Her curfew violation prompted a UA, which tested positive for alcohol. When questioned, TM denied a relapse and refused to cooperate with the shelter. As a result, the shelter evicted her. Following her eviction, TM lived in her own apartment. In August, TM graduated from family treatment court.

Meanwhile, PR had made progress in his treatment. Because of PR's progress, KJR and KKR returned home to PR on October 5, 2010. Almost a year later, in September 2011, KJR and KKR returned to foster care because PR admitted using methamphetamine. The Department did not place the girls with TM because she had tested positive for alcohol, was not participating

---

[6] Lifeline Connections is an outpatient support program that focuses on serving clients with mental illnesses.

[7] In May, KC had permanently moved to her father DC's home in Colorado.

[8] A low creatinine UA was a concern to the Family Treatment Court because it suggested the clients were trying to dilute their UAs on purpose.

in regular UAs, and was not considered appropriate for placement at the time. From September through December, TM tested positive for marijuana, methamphetamine, and alcohol.

Around February 2012, PR's father and stepmother in California offered to be a placement resource for KJR and KKR. KJR and KKR moved to California to live with their grandparents and reported a positive placement. TM had telephone contact on a regular basis with her daughters; but this contact gradually became erratic, and sometimes she did not call. After a while, TM's daughters did not want to talk with her on the phone.

That summer, TM was incarcerated multiple times for possession of a controlled substance and possession of stolen property. In early August, the juvenile court held another review hearing because KJR and KKR's California grandparents had asked that the girls move back to Washington. In the fall, TM continued to struggle with recovery: She missed UAs, had diluted UAs, tested positive for marijuana, and did not maintain contact with her case manager.

## B. Parental Termination Petition

On August 30, 2012, the Department filed a petition to terminate TM's parental relationship with KKR for the following reasons: (1) KKR had been found to be a dependent child as to TM in 2009; (2) under a court order, KKR had been in protective custody and placed in foster care until the court returned her to PR's care in October 2010; (3) in September 2011, the court had ordered KKR to be removed from PR's care and again placed in foster care; (4) the State had offered and provided multiple necessary services[9] to TM to help her correct her

---

[9] These services the Department offered included: regular casework services, supervision and placement of KKR in foster and relative care, voluntary service and safety plans, mental health and family counseling, referrals for substance abuse treatment and domestic violence counseling,

5

parenting deficiencies; (5) there was little likelihood that conditions could be remedied such that KKR could return to TM because (a) there had been a second dependency action regarding KKR, (b) TM had failed to comply with the court-ordered services, and (c) TM had failed to make changes necessary to care adequately for KKR; (6) continuation of the parent-child relationship would diminish KKR's prospects for early integration into a stable and permanent home; and (7) TM was currently unfit to parent KKR. The Department asserted that termination of the parent-child relationship was in KKR's best interests.

The same day, August 30, the juvenile court sent TM a notice of the Department's petition for termination of her parent-child relationship with KKR, noting the scheduled fact-finding/summons hearing set for October 19, 2012. TM received the notice personally from a process server. On September 12, the Department sent TM an amended notice of its petition for termination of TM's relationship with both KJR and KKR, with a court date scheduled for October 5, 2012. At the October 5 hearing, the juvenile court appointed an attorney for TM and a guardian ad litem for KKR and KJR. On December 21, the juvenile court granted the Department request for an order authorizing TM's mental health and substance abuse evaluators and treatment providers to disclose her mental health and substance abuse treatment records and to testify about TM's mental health and substance abuse treatment history.

TM continued her substance abuse treatment with Lifeline Connections until March 2013, when the Department transferred her into a different treatment program at Comet because she had begun demonstrating more severe mental health symptoms, she had made little progress

---

home support services, transportation assistance, and provision of medical, dental, and psychological care for KKR.

6

in her treatment with Lifeline Connections, and Comet served people with more severe mental health symptoms and substance use issues.

## II. PROCEDURE: TERMINATION TRIAL

On June 3, 2013, the juvenile court sent TM's Court Appointed Special Advocate (CASA), and the respective attorneys a notice that the termination of TM's parental rights trial would be set for August 5 for both KKR and KJR. TM's attorney had mailed the notice to TM and had personally handed the notice, twice, to TM, who was aware of her August 5 court date. But at the end of the week before her scheduled trial date, TM voluntarily turned herself in to the Clackamas County Jail (Oregon) on an outstanding failure to appear warrant; she remained in jail over the weekend. TM was scheduled to appear before an Oregon judge to determine her release date the afternoon of Monday, August 5, the same day her parental rights termination trial was set to begin in Washington.

### A. Motion for Continuance

Because TM was incarcerated in Oregon, her attorney appeared in the Washington juvenile court on August 5 and requested a continuance of the termination trial so TM could be present. The juvenile court noted that parents have a due process right to be involved in a termination proceeding, which due process comprises notice, an opportunity to be heard, and the right to be represented by counsel. Considering the notice factor, the trial court noted that on June 3 the juvenile court had mailed TM's attorney the notice setting trial for August 5 and that TM's attorney had mailed the notice to TM and had personally handed this notice to TM twice. The juvenile court then considered whether, given that TM was incarcerated, she had adequate

7

opportunity to be heard, noting that when an individual is incarcerated, the court "[does] a telephone hook-up, and [has] the trial." 1 VRP at 13.

In balancing the factors for determining whether proceeding without TM's physically appearing in court would violate her due process rights, the juvenile court noted (1) it was significant that TM's attorney had represented TM in her dependency hearings for at least five years, since 2007; (2) the parent has no absolute right to be personally present at a termination hearing, and the child has a right to permanency; and (3) the risk of error by proceeding with the trial in TM's physical absence was not substantial.[10] Noting that it preferred to have TM present in person, but because there was no guarantee of her release, the juvenile court decided that trial would proceed that morning and that TM could coordinate a "telephone opportunity" at some other time, agreeing to hold the telephone conference the next day. 1 VRP at 16, 191-92.

The next day, Tuesday, August 6, TM testified through a telephone conference from the Oregon jail. TM acknowledged that she had known about her parental terminal hearing in Washington on Monday, August 5; nevertheless, she asked to continue the trial so she could appear in person, explaining that she was supposed to have been released from the Oregon jail the night before, but had remained incarcerated because of her telephonic conference call court appearance in the Washington court. The juvenile court denied TM's request because there was no guarantee that she would be released from jail in time to appear the next day, Wednesday, if the trial court continued the case.

---

[10] The juvenile court reasoned that although TM was incarcerated, the risk of error in this case was not as great as it might have been if she had been arrested on new charges and was completely unprepared.

The juvenile court later found that TM had received notice of the parental termination trial, had been represented by the same counsel throughout the dependency and termination proceedings over a five-year period, and had adequate opportunity to be heard at trial. The juvenile court noted TM's three options for participating in the trial: (1) choosing not to participate, (2) testifying by telephone, or (3) presenting testimony by means of a declaration or deposition. Balancing TM's interest, the State's interest, and the risk of error created by the available procedures, the juvenile court concluded that the risk of error in proceeding with trial was not substantial. Noting that TM had voluntarily turned herself into jail on an outstanding warrant in Oregon, the juvenile court concluded that (1) TM's action was "akin" to making herself voluntarily unavailable, unlike a situation involving arrest on new charges; and (2) TM's attorney was well versed about TM's situation and was able to advocate for her appropriately. Clerk's Papers (CP) at 76.

## B. Trial Testimony

Department social worker Alessandro La Rosa testified that he had (1) worked with KJR and KKR from August 2005 to June 2006, before, during, and after the dependency was filed and established; (2) continued working with the family after the dependency was filed; and (3) focused on TM's drug and alcohol problems, offering random UAs, but had difficulty with TM and PR, who missed UAs, had many arguments, and lacked follow-through in their treatment. In January 2006, the State had filed for a dependency because of TM's missed UAs, a domestic violence incident, and TM's failure to follow KJR's feeding schedule. After the State established dependency, La Rosa transferred the case to another social worker, Janell Tschosik, in the permanency services unit.

Tschosik, the case manager for TM's family from July 2006 until April 2009, testified that when she took over the case, there was substantial neglect, domestic violence, and substance abuse, and KJR was in foster care. In October 2006, TM had unsupervised visits; Tschosik also noted that TM had domestic violence issues at the time, for which TM was arrested later. When KKR was born in February 2007, the Department received a call from the hospital, previously described in the earlier section of these facts. Tschosik described her safety concerns for the girls in TM's care: (1) TM took the girls with her to a hotel where she would spend nights with a man; (2) the girls witnessed domestic violence disputes between TM and PR, including a time when TM had grabbed KJR from PR's arms and PR had grabbed KJR back; (3) TM did not have stable housing; and (4) when Tschosik left the case, there remained concerns about TM's domestic violence issues, her drug and alcohol issues, and anger management issues.

Tara Harrington, the social worker assigned to TM since March or April 2009 (when TM opted into family treatment court), testified that when she (Harrington) had started working on TM's case, TM had recently graduated from inpatient treatment and had begun outpatient treatment through "Recovery Northwest." 1 VRP at 68. Harrington described TM's multiple sanctions through the family treatment court for positive UAs for drugs and alcohol, failing to turn in her meeting slips, failing to attend her treatment group meetings, and incarceration. Harrington opined that although TM had struggled for the first few months of her outpatient program, she had progressed and eventually graduated. Harrington also reported that during one of TM's supervised visitations with her daughters, the social worker found TM behaving erratically and found a man hiding in TM's bedroom. Harrington expressed concerns about TM's ability to provide appropriate structure during visits with her daughters.

Harrington further testified that in March 2010, TM began taking classes through Clark College, was working part-time, and violated a curfew at the shelter where she lived, which prompted a UA that tested positive for alcohol. TM's denial of a relapse and refusal to cooperate led to her eviction from the shelter. In July 2010, Harrington showed up unannounced for TM's unsupervised visit with KJR and KKR; Harrington was concerned because TM was not living in a safe neighborhood, and KKR and KJR were outside the house unsupervised. Inside the house, Harrington noticed a pair of men's shoes; when she questioned TM about the shoes, TM was evasive. KKR and KJR told Harrington that TM took them to different men's homes.

At TM's next dependency review hearing, TM had a positive UA that prompted Harrington's discussing a new alcohol and drug evaluation with TM, but TM failed to follow through. After that, "[t]hings went pretty downhill": TM did not attend her daughters' visits, missed her UA tests, and was referred back to "The Wellness Project" for mental health counseling. 1 VRP at 93.

Harrington also testified about TM's incarcerations during summer and fall 2012. TM continued to struggle with her recovery, missing UAs, producing diluted UAs, testing positive for marijuana, and failing to maintain contact with Harrington. TM also had a new boyfriend at the time. TM became involved with Lifeline Connections to address her mental health, drug, and alcohol issues. But in January 2013, TM missed another visit and a UA test. After that, TM maintained her UA testing attendance and did "well." 1 VRP at 128. TM also started producing "negative, clean UAs." 1 VRP at 128.

Harrington listed TM's parental deficiencies as follows: (1) her continued participation in domestic violence, (2) her ongoing drug use, (3) her mental health problems, and (4) her

resistance to acknowledging that there was a problem and that she needed to make changes. Given TM's extensive history of drug and alcohol use, Harrington opined that TM was unlikely to remedy her conditions such that KKR and KJR could live with her again in the near future. Harrington explained that KKR and KJR were doing well in foster care, seemed stable and content, had bonded with the foster parents, and referred to their foster parents as "Mom" and "Dad." 1 VRP at 178. Harrington believed termination of TM's parental rights was in the best interests of KKR and KJR.

TM's psychologist Dr. Christopher Kirk Johnson testified that he had evaluated TM in 2009. He opined that TM had a pattern of involvement with domestic violence relationships and explained that TM would relapse repeatedly when she felt overwhelmed and unable to cope. In assessing TM's personality, Dr. Johnson found that TM had an impulsive, immature, rebellious type of personality. Dr. Johnson also diagnosed TM with a substance abuse problem. Dr. Johnson stated that TM's housing condition was not stable and that she had been living in a shelter when he evaluated her. Dr. Johnson opined that if TM continued in the same pattern of sobriety with relapses, criminal involvement, and domestic violence involvement, she was not in a position to parent her children.

Melissa Guerra-Rushing, a mental health professional at Lifeline Connections, performed an assessment of TM in October 2012. According to Guerra-Rushing's assessment, TM had experienced methamphetamine problems since age 16, reporting daily use until August 2012. Guerra-Rushing diagnosed TM with alcohol dependence and amphetamine dependence. Guerra-Rushing reported that TM had made "little progress" in her mental health treatment. 1 VRP at 142. TM had continued treatment with Lifeline Connections until she transitioned into Comet in

March 2013, when she had begun demonstrating more severe mental health symptoms and had made little treatment progress with Lifeline Connections.

Dolcie Niemi, TM's case manager at Lifeline Connections, testified that TM had engaged in services with Lifeline Connections in February 2013. Niemi had worked with TM mostly on employment related goals, in which TM had made "poor progress." 1 VRP at 150.

City of Vancouver Police Officer Greg Zimmerman testified that he arrested TM on May 26, 2013, in response to her 911 call complaining that her boyfriend and his neighbors had assaulted her. TM and her then boyfriend had reported to Zimmerman that (1) they had been drinking heavily when TM began screaming and howling, causing a disturbance with the next door neighbors; (2) TM had challenged the neighbor to a fight; and (3) when TM's boyfriend had tried to intervene and bring TM back to the house, she had physically assaulted him. TM's boyfriend bore injuries from that assault—large scratches on his chest, back, and neck. One neighbor reported that she had seen TM hit her boyfriend. Zimmerman smelled alcohol on TM when he talked to her and arrested her for assault (domestic violence).

Grace Denny, TM's CASA volunteer, testified that she had worked on TM's case for four and a half years, starting with the second dependency hearing, and visited KKR and KJR monthly. Denny expressed concern about TM's ability to care for KKR and KJR, based on (1) her sighting of a man in TM's home on multiple occasions, (2) TM's failure to supervise KJR at a courtyard apartment during which KJR had previously broken her tooth on a swing and was again playing on the swing unsupervised when Denny visited; (3) a June 25, 2011 visit during which KKR had pointed to a bicycle, told Denny, "My mommy told me not to tell [Denny] whose bike that is," and KKR asked TM "why [sic] somebody [was] hiding" during the visit;

13

and (4) TM's allegedly disconnected and removed state during a supervised visit with KKR and KJR in January 2012. 1 VRP at 185.

Denny further testified that KKR and KJR were doing very well in their current foster home; they were "very, very comfortable" with their foster parents and seemed very happy. 1 VRP at 187. In contrast, KKR and KJR seemed confused or anxious after visits with their mother, which visits were upsetting to them. Denny opined that TM's record—failure to maintain sobriety and failure to stay away from domestic violence—rendered it unlikely that conditions would be remedied such that KKR and KJR could be returned to TM in the near future. Denny also opined that continuation of TM's parent-child relationship with her daughters diminished their prospects for early integration into a stable and permanent home. Denny believed that termination of TM's parental rights would be in the best interests of the children.

On August 6, 2013, the second day of the trial, TM testified by telephone that she believed she not receive a fair chance at reunification with her children, given that (1) she had completed family treatment court; (2) she had remained clean and sober for over two years; (3) she believed she could be successful in treatment and was willing to begin services again; and (4) her visits with her daughters had been inconsistent because their grandfather, with whom the girls lived, did not have cell phone reception on his property. Neither TM nor her counsel asked that TM remain on the phone during the remainder of the trial.

Whitney Hall, child and family therapist for KJR, testified that she had been seeing KJR since October 2012. During KJR's intake assessment, Hall learned that KJR had experienced neglect and abuse, had somatic complaints about her stomach, and wished to be a part of her foster family. KJR told Hall that TM used to "do drugs and bad things." 2 VRP at 238. KJR

also described in detail how her uncle, TM's brother, had sexually abused her. KJR asked to tell her foster mother about this abuse, which to Hall, showed KJR's immense trust in her foster mother. Hall opined that KJR needed permanent placement with parents who could support her and her emotional needs.

Amanda Jones, KKR's therapist, testified that she had diagnosed KKR with Post Traumatic Stress Disorder (PTSD). KKR had expressed to Jones that she, too, wished to live with her foster parents so they could take care of her; she referred to her foster parents as "Mom" and "Dad." 2 VRP at 243. Jones opined that KKR needed consistency, predictability, and caregivers who could identify and attune to her emotional and developmental needs.

The juvenile court recognized the parents' fundamental liberty interest in the care and custody of their children, the State's obligation to protect the health and safety of children, and the court's duty to balance these important interests. The juvenile court found that TM's children had been removed from her for 53 months. The court ruled that there was clear, cogent, and convincing evidence presented at trial that during the preceding 53 months services had been provided to TM for home support, parenting classes, drug and alcohol treatment, family treatment court, domestic violence and anger management, psychological evaluations, and UA testing to ensure TM's sobriety. The juvenile court also found that the State had made substantial efforts to offer TM services and to unify the family, but because TM lacked insight to improve or recognize her issues, it was unlikely she would improve enough to enable the State to return her children to her. The juvenile court further found that continuing TM's parent-child relationship would diminish the children's prospects for an early integration into stable and permanent homes. The juvenile court ruled that the best interests of the children was to

terminate the parent-child relationship with TM because TM was not a fit parent to care for them, she lacked insight into her parental deficiencies, and the likelihood she would remedy such parenting deficiencies was minimal.

On August 23, the juvenile court entered an order terminating TM's parental rights and "commit[ting]" the children to the Department's custody. CP at 75. The juvenile court entered the following pertinent findings of fact: There was little likelihood that conditions would be remedied so that the children could be returned to TM in the near future. TM's testimony that she had no drug and alcohol or domestic violence problems was consistent with Dr. Johnson's opinion that treatment would be unsuccessful because TM believed nothing was her fault so there was no need for her to change. And termination of TM's parental rights was in the best interests of the children, who desired permanency and would be further traumatized by maintaining the parent-child relationship with TM.

The juvenile court concluded that the State had established, by clear, cogent, and convincing evidence the factors enumerated under former RCW 13.34.180(1)(a) through (f) (2009) in its termination petition, and that termination of TM's parental rights was in the best interests of the children. TM appeals the juvenile court's August 23, 2013 order terminating her parental rights.[11]

---

[11] TM filed separate notices of appeal for KJR and KKR. Our court commissioner consolidated TM's appeals under RAP 3.3(a).

ANALYSIS

I. DUE PROCESS

TM first argues that the juvenile court violated her due process rights by denying her the right to be present at her termination proceeding.[12] Br. of Appellant at 22. More specifically, she contends that she had the right to be present at her termination proceeding because the circumstances in her case differ from those in *In re Interest of Darrow*, 32 Wn. App. 803, 649 P.2d 858, 98 Wn.2d 1008 (1982) and *In re Interest of F.H.*, 283 N.W.2d 202 (N.D. 1979). We recently rejected this argument in *In re Welfare of L.R.*, __ Wn. App. __, 324 P.3d 737 (2014), applying that rationale here, we similarly hold that the juvenile court did not violate TM's due process rights.

We review alleged due process violations de novo. *Post v. City of Tacoma*, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009). We recently held that a trial court does not violate a parent's due process rights by denying a parent's request to be present at her termination proceeding. *L.R.*, 324 P.3d at 738. DR, the mother of LR and AH, argued that the trial court violated her due process rights by proceeding with the first day of her termination trial in her absence. *L.R.*, 324 P.3d at 740. Like TM, DR was incarcerated when her termination trial began and moved for continuance so she could be transported from the corrections center to attend the trial in person. *L.R.*, 324 P.3d at 739. The trial court denied DR's motion for continuance, stating that there was no guarantee DR's transport request could be arranged in a timely manner or accommodated at

---

[12] TM also asserts that the juvenile court abused its discretion in denying her motion for continuance, but she conflates this argument with her due process argument. Therefore, we address them together.

all. *L.R.*, 324 P.3d at 739. Trial commenced with DR absent the first day; DR appeared telephonically for the next two days. *L.R.*, 324 P.3d at 739-40.

In determining whether a due process violation occurred, we applied the three *Mathews*[13] factors: (1) the parent's interests, (2) the risk of error created by the procedures used, and (3) the State's interests. *L.R.*, 324 P.3d at 740 (citing *Mathews*, 424 U.S. at 335). Though acknowledging that parents have a fundamental liberty interest in the care and custody of their children, we noted that this interest is not absolute and must be balanced against the other two *Mathews* factors. *L.R.*, 324 P.3d at 741. In considering the second factor, the risk of error, we held that there was little risk of error because DR was represented by counsel throughout the termination proceeding and, thus, had the opportunity to be heard and defend.[14] *L.R.*, 324 P.3d at 742. In considering the third *Mathews* factor, the State's interest, we held that the State had a strong interest in proceeding with the hearing, instead of allowing further delay, given that (1) the termination trial had already been continued three times from its originally scheduled date, and (2) there was no guarantee that a continuance would have made it possible for DR to be transported to the hearing. *L.R.*, 324 P.3d at 742. Balancing the *Mathews* factors, we held that DR's absence from the first day of the termination trial did not violate her due process rights: Her right to be present was not absolute, she missed only one day, she was represented by

---

[13] *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

[14] More specifically, we noted that (1) DR's attorney was present on the first day of trial to listen to the social worker's testimony and to cross-examine her, (2) DR appeared telephonically for the remaining days of trial and had the opportunity to privately consult with her attorney, (3) DR appeared for the last day of trial telephonically and had the opportunity to testify and offer evidence, and (4) the trial court permitted DR to recall the social worker as a witness when DR was present telephonically. *L.R.*, 324 P.3d at 741.

counsel, and the procedural safeguards in place reduced any risk of error and prejudice in proceeding without her the first day. *L.R.*, 324 P.3d at 742.

There is no constitutional right to appear personally in a civil, parental termination proceeding where a prisoner parent is afforded an opportunity to defend through counsel and by deposition or similar evidentiary techniques. *Darrow*, 32 Wn. App. at 808.[15] Applying our reasoning in *In re L.R.* here, we similarly hold that the juvenile court did not violate TM's due process rights. With respect to the first *Mathews* factor, we, too, acknowledge that, as a parent, TM has a fundamental liberty interest in the care and custody of her children. *L.R.*, 324 P.3d at 741. As for the second factor, the risk of error was low. Like DR, (1) TM was represented by counsel throughout the termination proceeding by counsel who had represented her for at least six years in TM's related dependency hearings; (2) TM's counsel was present on her first day of

---

[15] As Division One of our court has held:

> "From our review of cases from the various jurisdictions and the principles of law involved, we are compelled to conclude that a convict does not have a constitutional right to personally appear in a civil suit where he has been permitted to appear through counsel and by deposition, if appropriate. Any right to appear personally would have to rest upon convincing reasons and would ultimately be left to the sound discretion of the trial court.
>
> In making its determination the trial court may take into account the costs and inconvenience of transporting a prisoner from his place of incarceration to the courtroom, any potential danger or security risk which the presence of a particular inmate would pose to the court, the substantiality of the matter at issue, the need for an early determination of the matter, the possibility of delaying trial until the prisoner is released, the probability of success on the merits, the integrity of the correctional system, and the interests of the inmate in presenting his testimony in person rather than by deposition. The exercise of the trial court's discretion concerning a prisoner's right to appear personally in a civil action will not be overturned by this court in the absence of an abuse of that discretion which we have defined as an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court."

*Darrow*, 32 Wn. App. at 807-08 (quoting *F.H.*, 283 N.W.2d at 209-10).

trial to listen to the various witnesses' testimonies and to cross-examine them; (3) TM appeared telephonically for her second, and last day, of trial and had the opportunity to testify and to offer evidence. Furthermore, unlike DR, TM had voluntarily surrendered herself into custody in Clackamas County, Oregon, one business day before her termination proceeding was scheduled to begin; and like DR, there was no guarantee of her release in time for her to participate in person.[16] Weighing the State's interest in the proceeding, the third *Mathews* factor involves acknowledging the State's interest in protecting the rights of children, which includes speedy resolution of the termination proceeding. *In re Dependency of M.S.*, 98 Wn. App. 91, 95, 988 P.2d 488 (1999). Unlike the parent in *In re Darrow and In re F.H.*, TM argues that her attendance in person could have been "timely and safely procured." Br. of Appellant at 30. TM overstates the degree of her timely release: On the first day of TM's termination trial, her attorney told the Washington juvenile court that TM would be appearing in front of an Oregon judge that afternoon to determine whether she could be released from the Clackamas County Jail. But this Oregon hearing did not guarantee TM's release; rather, it was merely a hearing to determine whether she might be released from jail. Furthermore, TM's attorney did not know why TM was in jail in Clackamas County.

TM asserts that the juvenile court failed to consider the cost or inconvenience of transporting TM from jail to trial.[17] TM's assertion ignores the juvenile court's ruling:

> I recognize that once [TM] did turn herself in on the warrant, that they're not going to just turn her loose, and let her run over here for this civil hearing.

---

[16] The absence of a guaranteed release is a consideration in balancing the *Mathews* factors, but it is not an independent requirement. *See L.R.*, 324 P.3d at 742.

[17] *See Darrow*, 32 Wn. App. at 808.

20

> [I]f she's got Clark County warrants, which may or may not be true—if she has Clark County warrants, it's going to be difficult. We need to coordinate, because from Clackamas County, if there's a warrant holding her from Clark County, then she'll be transferred to Multnomah County. So she wouldn't be to Clark County on a Clark County warrant until Friday, Thursday evening and Friday.

1 VRP at 14-15, 16. Thus, like DR in *In re L.R.*, the juvenile court here noted there was no guarantee of TM's timely release from jail even if it granted a continuance. *See L.R.*, 324 P.3d at 742. In contrast here was the reality that KJR and KKR had been "out of care" for about four and a half years, they needed and deserved permanency, and they could become established in a permanent home only after resolution of TM's termination case. 1 VRP at 8. Thus, on the children's behalf, the Department had a strong interest in proceeding with the hearing rather than allowing further delay.

We hold that the *Mathews* factors balancing process does not support holding that the juvenile court violated TM's due process rights. Thus, TM's due process challenge fails.

## II. CHALLENGED TERMINATION FINDING AND CONCLUSION

TM next argues that the juvenile court erred in finding that there was little likelihood that TM would remedy her parental deficiencies, so that the children could be returned to her in the near future, because the State failed to produce clear, cogent, and convincing evidence to support that finding. We disagree.

Under RCW 13.34.190, a juvenile court may enter an order terminating all parental rights to a child only if the court finds that (1) the allegations contained in the petition as provided in former RCW 13.34.180(1) are established by clear, cogent, and convincing evidence; and (2) termination is proven by a preponderance of the evidence to be in the best interests of the child. RCW 13.34.190(1)(a)(i), (b). TM challenges only the juvenile court's factual finding that there

21

was little likelihood that her parental deficiencies would be remedied such that the children could be returned to her in the near future, and the juvenile court's legal conclusion that termination was in the children's best interests.

### A. No Likelihood that TM Will Remedy Parental Deficiencies and Conditions

When reviewing a termination order, we uphold the juvenile court's findings of fact if the findings are supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent and convincing evidence. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Clear, cogent and convincing evidence exists when the ultimate fact at issue is "highly probable." *K.S.C.*, 137 Wn.2d at 925. Substantial evidence is evidence that would persuade a fair-minded rational person of the truth of the declared premise. *In re Welfare of C.B.*, 134 Wn. App. 942, 953, 143 P.3d 846 (2006). Deference to the juvenile court is particularly important in termination proceedings; thus, we defer to the fact finder on issues of witness credibility and the persuasiveness of the evidence. *K.S.C.*, 137 Wn.2d at 925.

Factors that a juvenile court considers in determining whether parental deficiencies can be remedied so that the children can be returned in the near future include (1) a parent's psychological incapacity or mental deficiency that renders the parent incapable of providing proper care for the child, (2) use of intoxicating or controlled substances so as to render the parent incapable of providing proper care for the child for extended periods of time, and (3) documented unwillingness of the parent to receive and to complete treatment or documented multiple failed treatment attempts. Former RCW 13.34.180(1)(e)(i), (ii). The State has shown by clear, cogent, and convincing evidence that TM's parental deficiencies could not be remedied such that the children could be returned to her in the near future.

Although TM asserts that she had measurable success at various points during the dependency and at one point was "sober for two years," the bulk of other evidence, especially around her repeated relapses, shows otherwise. Br. of Appellant at 35. When TM was 20 weeks pregnant with KJR, her doctor was concerned that she was intoxicated. At one point, TM tested positive for drugs; when questioned, TM denied a relapse and refused to cooperate with the shelter, which led to her eviction from the shelter. Dr. Johnson testified that TM's substance abuse problems rendered her "unable to return to a parenting role." 1 VRP at 108. Guerra-Rushing, TM's mental health professional at Lifeline Connections, (1) diagnosed TM with alcohol and amphetamine dependence; (2) reported that she had made little progress in her mental health treatment; and (3) told the court that because TM was demonstrating more severe mental health symptoms and had made little progress in her treatment with Lifeline Connections, she had to transfer to a different treatment program, Comet.

Niemi, TM's Lifeline Connections' case manager, testified that TM had made poor progress toward her employment-related goals. Denny, TM's CASA volunteer, testified that TM's repeated failures to maintain sobriety and to stay away from domestic violence rendered it unlikely that conditions would be remedied such that KKR and KJR could be returned to TM. Harrington, TM's social worker, testified extensively about TM's multiple family court sanctions for positive urinary analyses showing drugs and alcohol use; she opined that given TM's extensive history of drug and alcohol use, she was unlikely to remedy her conditions such that KKR and KJR could live with her again in the near future. And Officer Zimmerman testified about TM's May 2013 arrest for domestic violence, when TM had been drunk and allegedly assaulted her then boyfriend and his neighbors.

23

In addition, the evidence showed that TM failed to provide a safe and stable environment for KJR and KKR, contrary to a 2006 court order requiring TM to provide safe and stable housing for her children. Instead, TM constantly exposed KJR and KKR to different men with whom she spent the night at hotels and in her home. For example, during one of Denny's visits with KKR and KJR, KKR had asked TM "why [sic] somebody [was] hiding." 1 VRP at 185. During one of Harrington's visits, she had noticed a pair of men's shoes; but when she questioned TM about the shoes, TM was evasive in her responses. And at one point, TM had lived with her brother, who had sexually abused KJR In light of the extensive testimony and exhibits, we hold that the State provided substantial evidence to prove clearly, cogently, and convincingly that TM had a low likelihood of remedying her parental deficiencies.

## B. Best Interests of the Children

As we noted earlier, the Department must prove by a preponderance of the evidence that termination of parental rights is in the children's best interests. RCW 13.34.190(l)(b). We consider the facts and circumstances of each individual case to determine the best interests of a child. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). In so doing, we place a "[v]*ery strong* reliance on trial court determinations of what course of action will be in the best interests of the child." *In re Welfare of Todd*, 68 Wn.2d 587, 591, 414 P.2d 605 (1966) (emphasis added). When a parent fails to rehabilitate over a lengthy dependency period, a trial court is fully justified in finding termination to be in a child's best interests. *In re Dependency of J.A.F.*, 168 Wn. App. 653, 670, 278 P.3d 673 (2012). Such is the case here.

The record is replete with numerous instances in which TM exhibited patterns of failure to provide a safe and stable environment for KJR and KKR by exposing them to different men,

culminating in her brother's sexual abusing of KJR. In addition, TM's extensive history of drug and alcohol use, along with her repeated involvement with domestic violence relationships, did not put her in a position to provide a safe and stable environment for KJR and KKR.

In stark contrast, KJR and KKR both expressed that they were "very, very comfortable" with their foster parents and seemed happy with them. 1 VRP at 187. Before this foster placement, KJR had experienced neglect and abuse; and she had somatic complaints about her stomach. And KJR reported that TM used to "do drugs and bad things." 2 VRP at 238. After placement with her current foster family, however, KJR expressed her wish to be a part of her foster family, calling them her "forever family." 2 VRP at 235. And when TM's brother sexually abused KJR, she asked to tell her foster mother about this abuse, showing great trust in her foster mother. KKR similarly expressed her wish to live with her foster parents so they could take care of her; and she referred to her foster parents as "Mom" and "Dad." 2 VRP at 243. KKR needed consistency, predictability, and caregivers that could identify and attune to her emotional and developmental needs.

Further, as mentioned above, Denny and Harrington testified about TM's repeated failures to stay away from domestic violence and to remain sober. Harrington also opined that given TM's continued participation in domestic violence, her ongoing drug use, her mental health problems, and resistance to acknowledging she had a problem and needed to change her lifestyle; it was unlikely that TM would remedy conditions so that KKR and KJR could live with her again in the near future. Denny similarly opined that continuing TM's parent-child relationship with her daughters diminished their prospects for early integration into a stable and

permanent home. Both Harrington and Denny believed that termination of TM's parental rights would be in the children's best interests.

The Department proved, by a preponderance of the evidence, that termination of TM's parental-child relationship was in the children's best interest. This evidence supports the juvenile court's ruling that termination of parental rights was in the best interests of the children. Accordingly, we affirm the juvenile court's termination of TM's parental rights.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Bjorgen, A.C.J.

Lee, J.