# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Dependency of R.O.A., date of birth 09/06/17, | ) ) ) | No. 79997-5-I consolidated with No. 79998-3-I |
| Minor Child. | ) ) | |
| STATE OF WASHINGTON, DEPARTMENT OF CHILDREN, YOUTH, AND FAMILIES, | ) ) ) ) ) | |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| SIERRA LEE COTTER, | ) ) | FILED: February 3, 2020 |
| Appellant. | ) ) ) | |

VERELLEN, J. — Sierra Cotter, the mother of R.A., appeals from orders denying her petition for a permanent guardianship and terminating her parental rights. We conclude the trial court properly balanced the appropriate factors in terminating the mother's parental rights rather than granting a permanent guardianship.[1] Substantial evidence supports the court's findings of fact, and

---

[1] It is important to keep in mind the distinction between a "dependency guardianship" for a dependent child under ch. 13.34 RCW and a permanent guardianship under ch. 13.36 RCW. In a dependency guardianship, a guardian is appointed "for the limited purpose of assisting the court to supervise the dependency," RCW 13.34.232, while a permanent guardianship under RCW 13.36.010 provides a final resolution of a dependency for a child "who cannot safely be reunited with his or her parents." This appeal addresses the mother's petition for a permanent guardianship as an alternative to termination of the parent-child relationship.

those findings support the court's conclusions, including the determination that termination is in the best interests of the child. We affirm.

FACTS

On September 6, 2017, R.A. was born and tested positive for methadone, opiates, and amphetamines. The mother has a history of substance abuse and other concerns. The hospital placed an administrative hold on R.A. on September 9, 2017, and he has never been in the custody of the mother. The Department of Children, Youth, and Families (Department) filed a dependency petition on September 12, 2017. The mother agreed to shelter care.

R.A.'s maternal grandmother, Lisa Cotter, is a United States citizen who moved to Canada. As soon as the grandmother was contacted by the mother shortly after R.A's birth, she traveled to Washington and began caring for R.A. The grandmother lives locally in the house of her friend, Ms. Ryden. The grandmother has taken care of R.A. "his entire life."[2] The grandmother "is basically the child's parent" and is willing to adopt R.A.[3] She "is willing to stay in Washington as long as she needs to finalize the adoption, including remaining in the United States permanently."[4]

The mother filed a chapter 13.36 RCW permanent guardianship petition in December of 2018, proposing her father, Tor Cotter, and his wife, Linda Lira, as

---

[2] Clerk's Papers (CP) at 16.

[3] CP at 17.

[4] CP at 17.

guardians. Cotter and his wife live in Washington and completed a home study. The court found they are "suitable and qualified" guardians.[5]

During the dependency, R.A. had regular weekly visits with the proposed guardians and extended family members living in Washington, including alternating weekend contact with his maternal uncle and two young cousins. The mother did not visit consistently. Between the start of the dependency in September 2017 and February 2018, the mother visited just once even though the grandmother allowed visitation anytime she called. Beginning in February 2018, the mother failed to confirm visits, resulting in the cancellation of two contracts for supervised visitation. She also had the opportunity to visit R.A. during his visits with the maternal grandfather and his wife, but she missed nearly one-third of those opportunities. The mother also failed to make meaningful progress in several attempts at substance abuse treatment. The mother was in jail in May of 2018, July to November of 2018, and beginning in March 2019.

The trial court considered the Department's petition for termination and the mother's petition for a permanent guardianship. The mother raised the issue whether the potential adoption by the grandmother was likely because she and her husband owned a farm in Nova Scotia and because she had not satisfied the Hague Convention on Protection of Children and Co-operation in Respect of

---

[5] CP at 16.

3

Intercountry Adoption (Hague Adoption Convention or Convention)[6] requirements for an adoption that would move R.A. from Washington to Canada. Specifically, the mother challenged the grandmother's lack of a completed home study in Canada and argued the grandmother failed to attempt to recruit a domestic (United States) placement. The guardian ad litem and caseworker testified in favor of termination and against the proposed guardianship, focusing on the grandmother's close bond with R.A.

In its March 4, 2019 oral decision, the court found that the elements for termination were satisfied. It is undisputed that the mother is currently unfit to parent, that the Department has expressly and understandably offered or provided all necessary services to remedy the situation, and that there is little likelihood conditions will be remedied such that the child can be cared for by the mother in the near future. Additionally, the court found "the mother has been out of the picture for the majority of the child's life," "[t]here is no quality relationship between the mother and this child at present," and "there is not much of a parent-child bond."[7]

The court determined that termination in contemplation of adoption by the grandmother was preferable to permanent guardianship. The court recognized that if the adoption by the grandmother was not viable, then the proposed

---

[6] Hague Conference on Private International Law: Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption, May 29, 1993, https://www.hcch.net/en/instruments/conventions/full-text/?cid=69.

[7] CP at 16.

guardianship by the grandfather and his wife would be preferable to adoption by a stranger. The court allowed the Department an additional six weeks to complete a home study of the grandmother.

On April 15, 2019, the Department advised the court that a favorable local home study of the grandmother had been completed and it was just awaiting the grandmother's background check. Background checks of the grandmother's husband and Ms. Ryden had been successfully completed.

On May 8, 2019, the court allowed the proceeding to be reopened to allow testimony by the caseworker updating the court with the favorable results of the grandmother's background check and completed home study. The court entered its findings and order granting the petition for termination and its order denying the guardianship petition.

## ANALYSIS

To terminate the parent-child relationship, the Department must prove each of the following statutory elements by clear, cogent, and convincing evidence:

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable

future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future [and] . . . .

(f) That the continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.[8]

If all of these elements are proven, the trial court must also find by a preponderance of the evidence that termination is in the "best interests" of the child.[9]

We review an order terminating parental rights to determine if substantial evidence supports the court's findings and if those findings in turn support its conclusions.[10] "Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise."[11] "Unchallenged findings are verities on appeal."[12] Because only the trial court has the opportunity to hear the testimony and observe the witnesses, we do not judge the credibility of witnesses, nor do we weigh the evidence.[13]

The requirements for termination of a parent-child relationship are undisputed here with the exception of the RCW 13.34.180(1)(f) requirement that

---

[8] RCW 13.34.180(1).

[9] RCW 13.34.190(1)(b).

[10] In re Welfare of K.M.M., 187 Wn. App. 545, 564, 349 P.3d 929 (2015).

[11] In re Welfare of C.B., 134 Wn. App. 942, 953, 143 P.3d 846 (2006).

[12] In re Dependency of M.S.R., 174 Wn.2d 1, 9, 271 P.3d 234 (2012).

[13] In re Dependency of A.V.D., 62 Wn. App. 562, 568, 815 P.2d 277 (1991).

continuing with the parent child relationship "clearly diminishes the child's prospects for early integration into a stable and permanent home" and the RCW 13.34.190 requirement that termination is in the "best interests" of the child. The Department is not required to prove a stable and permanent home is available at the time of termination.[14] Neither is a specific prospective adoptive home necessary to satisfy the integration into a stable and permanent home requirement.[15]

A guardianship under chapter 13.36 RCW is a statutory alternative to termination that permanently provides guardians with physical and legal custody of a child until the child reaches the age of majority.[16] In addition to other requirements, the court must find that the guardianship rather than a termination with adoption or continued efforts to return the child to the parent is in the best interests of the child.[17]

If a court in a dependency is faced with competing petitions for termination and for a permanent guardianship of a child and the first five requirements for termination or such a guardianship are satisfied, as they are here,

---

[14] In re Dependency of K.D.S., 176 Wn.2d 644, 658, 294 P.3d 695 (2013) (quoting In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999)).

[15] In re Dependency of J.A.F., 168 Wn. App. 653, 668, 278 P.3d 673 (2012) (quoting K.S.C., 137 Wn.2d at 927).

[16] RCW 13.36.010 ("The legislature intends to create a separate guardianship chapter to establish permanency for children in foster care through the appointment of a guardian and dismissal of the dependency.").

[17] RCW 13.36.040(2)(a).

7

the question is whether guardianship is preferable: whether guardianship, rather than termination of the parent-child relationship or continuation of efforts to return the child to the custody of the parent, would be in the best interests of the child. Embedded in the statute is a comparison between guardianship and termination. The question is which better serves the child's interests.[18]

In making such a determination, the court should look to a nonexclusive list of factors:

> [I]n addition to the qualifications of the proposed guardian, considerations should include the strength and nature of the parent-child bond; the benefit of continued contact with the parent or the extended family; the need for continued state involvement and services; the likelihood the child would be adopted if parental rights were terminated, and any other case-specific factors relevant to the best interests of the child.[19]

Here, the trial court expressly recognized and addressed those factors.

First, the proposed guardians were found "suitable and qualified."[20] Second, the court determined that there is "not much of a parent-child bond," the mother "has been out of the picture for the majority of the child's life," and "[t]here is no quality relationship between the parent and the child at present."[21] The mother challenges the sufficiency of the evidence supporting those findings. But viewing the evidence and reasonable inferences in a light most favorable to the Department, her challenge fails. The court's findings are particularly supported by the mother's inconsistent visitation, her failure to make meaningful progress in

---

[18] Dependency of A.C., 123 Wn. App. 244, 249-50, 98 P.3d 89 (2004) (citing former RCW 13.34.231(6) (2000)).

[19] Id. at 254-55.

[20] CP at 16.

[21] CP at 16.

treatment of her substance abuse, and her repeated incarceration. Additionally, R.A. does not have special needs, and there is no demonstrated need for ongoing services. This appeal turns on "the likelihood the child would be adopted if parental rights are terminated" and "other case-specific factors related to the best interests of the child."[22]

The mother argues that the proposed adoption by the grandmother is subject to the Hague Adoption Convention because Canada is a signatory and because the grandmother has indicated her desire to return there. As a result, she argues, the grandmother must be approved in a Canadian home study, and she must make reasonable efforts to find a domestic placement.

An intercountry adoption is one involving parents who reside in one country and a child who resides in another. Both the United States and Canada have adopted and ratified the Hague Adoption Convention, which "provides a framework for the adoption of children habitually resident in one country party to the Convention by persons habitually resident in another country party to the Convention. It establishes procedures to be followed in such adoption cases and imposes safeguards to protect the best interests of the children concerned."[23]

---

[22] A.C., 123 Wn. App. at 255.

[23] See Intercountry Adoption—Issuance of Hague Convention Certificates and Declarations in Convention Adoption Cases, 71 Fed. Reg. 34857-01 (June 16, 2006) (to be codified at 22 C.F.R. § 97.6-97.7); see also Hague Adoption Convention, art. 1.

In the United States, the Hague Adoption Convention is implemented through the Intercountry Adoption Act of 2000 (IAA).[24] The State Department is responsible for the IAA's administration.[25] A "Convention adoption" under the IAA includes "an adoption of a child resident in the United States by an individual residing in another Convention country."[26] Guidance issued by the State Department explains that an outgoing Convention adoption is one in which "the prospective adoptive parent(s) demonstrate their intent to move the child from the United States to another Convention country after adoption."[27] The IAA sets forth requirements for state courts entering orders in outgoing Convention adoptions.[28] A state court may not enter an order declaring an outgoing Convention adoption final unless the court has:

- Determined that the adoptive placement is in the best interests of the child;

- Verified documentation showing that a background study of the child has been completed;

---

[24] 42 U.S.C. § 14901.

[25] 42 U.S.C. § 14911(a)(1).

[26] 42 U.S.C. § 14902(10). Similarly, Hague Adoption Convention article 2(1) states that it applies where "a child habitually resident in one Contracting State ('the State of origin') has been, is being, or is to be moved to another Contracting State ('the receiving State') either after his or her adoption in the State of origin by spouses or a person habitually resident in the receiving State, or for the purposes of such an adoption in the receiving State or in the State of origin."

[27] U.S. DEP'T OF STATE, THE HAGUE CONVENTION ON INTERCOUNTRY ADOPTION: A GUIDE TO OUTGOING CASES FROM THE UNITED STATES 7 (December 2011) (Outgoing Cases Guide), https://travel.state.gov/content/dam/aa/pdfs/OutgoingCasesFAQs_2011.pdf [https://perma.cc/EF4Z-GRLU].

[28] 42 U.S.C. § 14932(b).

- Verified documentation that the adoption service provider has made reasonable efforts to place the child in the United States and has been unable to do so;[29]

- Verified documentation of the U.S. authorized entity's determination that the adoptive placement is in the best interests of the child;

- Verified the home study on the prospective adoptive parent (background report);

- Verified the declaration by the Central Authority . . . of the receiving country that the child will be permitted to enter and reside permanently in the receiving country;

- Verified the declaration by the Central Authority . . . of the receiving country that the Central Authority consents to the adoption, if necessary; and

- Verified satisfactory evidence that the requirements of Articles 4 and 15 through 21 of the [Hague Adoption] Convention have been met.[30]

---

[29] If the proposed adoptive parent is a relative of the child or if the birth mother or biological parents have identified specific prospective adoptive parents, there is no requirement that efforts be made to recruit adoptive parents in the United States. 22 C.F.R. § 96.54(a).

[30] Outgoing Cases Guide at 11-12; 22 C.F.R. § 97.3. Articles 4 and 15 through 21 of the Hague Adoption Convention, in relevant part, assign to the authorities of the country of origin and the receiving country responsibility for preparing and transmitting reports on the proposed adoptive parents and the child to be adopted (articles 15 and 16), ensuring that, if required, appropriate consents have been freely given (article 4), ensuring that both central authorities have agreed the adoption may proceed (article 17), ensuring that the child will be permitted to leave the country of origin and enter and reside permanently in the receiving country (article 18), and arranging to keep the foreign entity informed about the adoption process, measures taken to complete it, and its progress (article 20).

Once an adoption is finalized by the state court, the adoptive parents may apply to the State Department for a Hague Adoption Certificate (HAC).[31] An HAC signals to the receiving country that the adoption was completed in accordance with the Hague Adoption Convention and the IAA and ensures the adoption will be recognized by operation of law in the receiving country.[32] The application for an HAC must include an official copy of the adoption court's findings verifying, in substance, that each of the requirements of 22 C.F.R. § 97.3 has been met.[33] If a state court finalizes an adoption that fits the definition of an outgoing Convention adoption without adhering to the requirements of the IAA and 22 C.F.R. § 97.3, the adoptive parents are likely to face significant immigration consequences when they travel home. The government of Canada, for example, will not admit an adopted child unless the child has been granted either citizenship or a permanent

---

[31] 22 C.F.R. § 97.2. If the child will emigrate to the receiving country before the adoption is final, the adoptive parents may apply for a Hague Custody Declaration. 22 C.F.R. § 97.2.

[32] Hague Adoption Convention, art. 23.

[33] 22 C.F.R. 97.2(b). The requirements of 22 C.F.R. 97.3 are substantively very similar to those of the IAA but not identical. For example, the IAA requires the state court to verify a background report or home study on the prospective adoptive parents (including criminal background checks) prepared in accordance with the laws of the receiving country. 42 U.S.C. § 14932(a)(2)(B). To obtain a HAC, the home study must, in addition to meeting the statutory requirements, be transmitted directly from the central authority of the receiving country or an agency authorized by the foreign government to perform central authority functions to the appropriate United States authorized entity, which may be the state court or an approved state agency. 22 C.F.R. § 97.3(d). Further, the home study must include the specific information set forth in 22 C.F.R. 97.3(d)(1)-(3).

resident visa.[34] Further, immigration authorities in Canada attempt to ensure that intercountry adoptions comply with international law before granting permission to enter: "If it is determined that the legal requirements for international adoptions have been circumvented, the citizenship application of the adopted person must be refused."[35]

---

[34] The Canadian Immigration and Refugee Protection Act (IRPA) provides that a foreign national may not enter Canada without applying for a visa. IRPA, S.C. 2001, c. 27, s. 11(1). Canadian law provides two avenues for Canadian residents to bring their adopted child into Canada legally. One is to obtain a grant of citizenship for the child and the other is to obtain a permanent resident visa. A child adopted from abroad may be granted citizenship, with some exceptions, if at least one of the adoptive parents is a Canadian citizen and the adoption meets the statutory and regulatory requirements. See Citizenship Act (CA), R.S.C. 1985, c. C-29, s. 5.1; Citizenship Regulations (CR) SOR/93-246 s. 5.1(c); CR No. 2, SOR/2015-124, s. 5. A significant restriction on granting citizenship under the CA is Canada's first generation limit, which may prevent an adoptive Canadian citizen parent who was born outside Canada to a Canadian parent from obtaining citizenship for his or her adoptive child born outside Canada. See CA R.S.C. 1985, c. C-29, s. 5.1.

The permanent resident visa approach is available to both Canadian citizens and permanent residents who adopt a child outside Canada. An adopted child may enter Canada as a permanent resident by being sponsored as a member of the family or other provisions. See IRPA S.C. 2001 c. 27, s. 12(1) (family member), s. 13(1) (sponsorship of foreign national by a permanent resident); Immigration and Refugee Protection Regulations, SOR/2002-227 117(1)(g), (2), (3).

Because both the adoption and the immigration processes can be lengthy, the Canadian government advises adoptive parents to "not plan to return to Canada with the adopted child until you know for certain that all citizenship or immigration requirements have been met." Important Notice for adoptive parents – Before you travel, https://www.canada.ca/en/immigration-refugees-citizenship/services/canadians/adopt-child-abroad/authorities.html (boldface omitted).

[35] CITIZENSHIP & IMMIGRATION CAN., CITIZENSHIP POLICY CP 14: GRANT OF CANADIAN CITIZENSHIP FOR PERSONS ADOPTED BY CANADIAN CITIZENS 38 (2015) (Adoption Policy Manual), https://www.canada.ca/content/dam/ircc/migration/ircc/english/resources/manuals/cp/cp14-eng.pdf [https://perma.cc/L722-726B]. The

The mother contends that if the grandmother finalizes the adoption of R.A. premised on the home study completed here in Washington state, the adoption will fail to meet the Convention's requirements and will not enable R.A. to emigrate to Canada. But the mother does not challenge the trial court's finding that the grandmother is willing to permanently move to the United States, if necessary, to complete an adoption. If the grandmother establishes a habitual residence in the United States, the mother provides no authority that the Hague Adoption Convention will apply.[36]

And even assuming the Hague Adoption Convention might apply to a future adoption proceeding, the mother does not provide compelling authority that the grandmother will have to make reasonable efforts to recruit a domestic placement. The requirement to recruit a competing petitioner does not extend to an adoption

Adoption Policy Manual also addresses circumstances in which adoptive parents seek to avoid involving the Canadian provincial adoption authorities by finalizing the adoption while abroad and then reporting that they were not residing in Canada when they adopted the child. In the case of a child emigrating from a Hague Convention country, if there is doubt about the actual legal residence of the adoptive parents at the time of the adoption, immigration officials will request the adoptive parents to provide an HAC. Adoption Policy Manual, 40. The State Department defers to the receiving country's determination that a prospective adoptive parent resides in that country. See Outgoing Cases Guide at 8.

[36] The Hague Adoption Convention does not include a definition of "habitually resident" for purposes of intercountry adoptions. Counsel for the Department and the mother were requested to appear for oral argument prepared to address the requirements for habitual residents under the Hague Adoption Convention. Although there appears to be limited authority, both acknowledged that the term "habitually resident" for purposes of the Hague Adoption Convention seems to focus on concepts of domicile. See generally 8 C.F.R. § 204.303. There is no authority that the grandmother, a United States citizen, will be incapable of establishing domicile in the United States if she permanently relocates to the United States.

by a blood relative.[37] As to a Canadian home study requirement, the grandmother may yet satisfy that requirement. The limited record regarding the months of delay in the grandmother's attempts to obtain a Canadian home study suggest bureaucratic confusion rather than any doubts about the grandmother's background and qualifications.

For purposes of resolving competing Washington petitions for termination and dependency guardianship, the key factor is the likelihood of an adoption, not the certainty of an adoption. By allowing additional time to obtain the results of a home study, the trial court focused on the viability of an adoption. The court was satisfied by a favorable Washington home study that the grandmother was likely to qualify for an adoption. The record does not reveal any concerns raised in the home study about the grandmother's background. In this setting, it would be inappropriate for this court or the trial court to forecast the precise outcome of the yet-to-be-heard adoption matter.

The trial court here had the opportunity to see and hear the grandmother testify and gauge her sincerity when she represented her willingness to do what it takes to accomplish an adoption, including a permanent move to the United States. We do not resolve issues of credibility on appeal. It will be up to the adoption court to determine whether the Hague Adoption Convention applies based on the circumstances present at the time of the adoption.

---

[37] 22 C.F.R. § 96.54(a), (b).

Further, the mother argues that an adoption resulting in R.A.'s move to Canada will impede an ongoing relationship between R.A. and his extended family in Washington. Of course, similar to a move to the East Coast of the United States, a relocation to Canada may inhibit the frequency of contact with the extended family. But, as found by the trial court, the grandmother is willing to grant access to extended family members and the mother.

Ultimately, the trial court had the discretion to conclude that the case-specific factors related to the best interests of R.A. are served by a termination with the potential for an adoption by the grandmother, who has cared for R.A. his entire life and "is basically the child's parent."[38] We conclude it was within the trial court's legitimate exercise of its discretion to opt for termination in contemplation of a potential adoption by the grandmother rather than a permanent guardianship. The trial court adequately considered the appropriate factors.

We affirm.

WE CONCUR:

[38] CP at 16.