# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>E.Z.-M.,<br><br>      Minor child.<br><br><br><br>STATE OF WASHINGTON,<br>DEPARTMENT OF CHILDREN,<br>YOUTH, AND FAMILIES,<br><br>      Respondent,<br><br>      v.<br><br>CLAUDIA ZAPATA,<br><br>      Appellant. | No. 81310-2-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

APPELWICK, J. — Following a dependency of more than six years, the juvenile court terminated the mother's parental rights as to her 14 year old son. Substantial evidence supports the court's finding that there was no reason to know that the child was an Indian child and therefore, the federal Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, did not apply to the proceeding. Substantial evidence also supports the finding that the Department of Children, Youth, and Families provided all necessary and reasonably available services that were capable of correcting parental deficiencies. We affirm the order of termination.

FACTS

Claudia Mercado-Preciado[1] is the mother of eleven children, including E.Z.-M. The court terminated the parental rights of E.Z.-M.'s biological father by a separate default order and he is not a party to this appeal.

In 2013, the mother was living with seven of her children, who ranged in age from 12 years to 20 months. The family came to the Department's (Department of Children, Youth, and Families) attention due to concerns about the mother's failure to protect one of her children from abuse, inadequate supervision, inconsistent school attendance, lack of appropriate medical and dental care, unsafe and illegal transportation, and unsafe and unsanitary conditions in the home. In June 2013, after services offered by the Department failed to address the issues identified by the Department, the mother agreed to place E.Z.-M. and two of his siblings in licensed care. E.Z.-M. was seven years old at the time. By the end of November 2013, the Department had placed the other four children in licensed care. E.Z.-M. has remained in the same licensed care placement since that time.

In January 2014, the court entered an order finding all seven children dependent as to the mother based on stipulated facts. Between 2013 and 2015, the mother participated in a psychological evaluation and completed numerous services, including all of those required by the dispositional order. Between 2014 and 2018, the mother also gave birth to four more children, including a set of

---

[1] We use the surname the mother provided in her testimony at trial.

twins. None those children were removed from the mother's care and in 2015, she married the father of her four youngest children.

In February 2017, the court ordered the Department to implement a staggered reunification plan to return E.Z.-M.'s six siblings to their mother. E.Z.-M. was not included in the plan because he objected to reunification and visitation with his mother was left to his discretion. Between 2016 and 2019, all of E.Z.-M.'s siblings were returned to the mother's home and the dependencies with respect to those children were dismissed.

Aware of the strained relationship between E.Z.-M. and his mother, the Department recommended that they participate in joint therapy. The mother was amenable to this, but E.Z.-M. was not. The Department filed a motion seeking a court order to require their participation. Largely based on the recommendation of E.Z.-M.'s therapist, the court denied the Department's motion, finding that forcing E.Z.-M. to participate in the service against his wishes was not in his best interest.

In April 2019, the Department filed a petition seeking to terminate the mother's parental rights. E.Z.-M., represented by counsel, supported the Department's petition. At the time of the fact finding hearing on the Department's petition in February 2020, the mother was living in transitional housing with her spouse and all of her children, except E.Z-M. The testimony at trial indicated that although the mother believed she had a strong connection with E.Z.-M., he had a very different perspective.

E.Z.-M. testified and expressed his wish to be adopted by his foster parent and his opposition to removal from the established home where he had spent "half [his] life." He said that the possibility that he would be forced to reunite with his mother made him feel "scared" and caused him anxiety.

According to therapist who treated E.Z.-M. for approximately three years, the primary reason that E.Z.-M. required therapy was to address the anxiety caused by his fear of being removed from his home and his feeling of being "in limbo." According to the therapist, E.Z.-M.'s anxiety caused physical symptoms, made it difficult to focus, and prevented him from fully engaging or expanding his social connections. The therapist testified that E.Z.-M. lacked "trust or faith" in his mother. The therapist reported that E.Z.-M. felt manipulated by his mother and felt that she did not prioritize him or his needs. E.Z.-M. also told his therapist that he did not believe that his mother was sincere when she expressed a desire to repair their relationship, because when they spent time together, she did not try to connect. The therapist testified that throughout the time she worked with him, E.Z.-M. clearly and consistently said he did not want to return to his mother's care.

The social worker assigned to the case since 2017 testified that the mother's parental deficiency as to E.Z.-M. was her lack of a bond with him, which led E.Z.-M. to believe that he had no "place" in the family. The social worker also described E.Z.-M.'s "prolonged" anxiety as directly stemming from the threat of being returned to the care of his mother. When asked whether there would be any value in continuing the dependency to try to rebuild the parent-child

4

relationship, the social worker testified that continuing the dependency would only cause harm to E.Z.-M. and would "not assist in the bond with his mother." She testified that termination of the mother's parental rights was in E.Z.-M.'s best interests because he needed a "sense of permanency" and because he had made clear his wishes for his future.

On March 3, 2020, after considering the testimony of 13 witnesses and approximately 50 exhibits, the court entered findings of fact, conclusions of law and an order terminating the mother's parental rights. Regarding the child's Indian status, the court found there was no reason to know that the child was an Indian child and that ICWA did not apply. The court also found that the mother was unfit due to her lack of a bond with E.Z.-M. The court further determined that the Department had offered to the mother all necessary services, reasonably available and capable of correcting the parental deficiencies within the foreseeable future. In view of the mother's inability to change her relationship with E.Z.-M. during the long dependency, the court determined there was little likelihood that the condition precluding reunification could be remedied in the foreseeable future. Finally, due to the clarity of E.Z.-M.'s wishes and the impact of the prolonged dependency on him, the court found that termination of the mother's parental rights was in E.Z.-M.'s best interests.

## DISCUSSION

### I.  Standard of Review

Parents enjoy fundamental liberty interests in the continued care and custody of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct.

1388, 71 L. Ed. 2d 599 (1982). Termination of the parent-child relationship involves a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove the six termination factors set forth in RCW 13.34.180(1) by clear, cogent, and convincing evidence. Id. One of these factors is whether the Department has provided all the services ordered as part of the dependency proceedings, as well as "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future."[2] RCW 13.34.180(1)(d). If this burden is satisfied, the court must also find by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); In re Dependency of T.R., 108 Wn. App. 149, 160-61, 29 P.3d 1275 (2001).

Where, as here, the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the court's findings of fact and whether those findings support the court's conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Unchallenged findings of fact are verities on appeal. In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Challenged findings will be upheld "[i]f there is substantial evidence that the lower court could reasonably have found to be clear, cogent and convincing." In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" In re Dependency of

---

[2] A condition that prevents reunification constitutes a parental deficiency. See In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010).

T.L.G., 126 Wn. App. 181, 197, 108 P.3d 156 (2005) (quoting In re Dependency of H.W., 92 Wn. App. 420, 425, 961 P.2d 963, 969 P.2d 1082 (1998)).  We defer to the trier of fact on issues of conflicting testimony, credibility of the witnesses, and the weight or persuasiveness of the evidence.  See In re Termination of S.J., 162 Wn. App. 873, 881, 256 P.3d 470 (2011).  Such deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her."  A.W., 182 Wn.2d at 711.

## II.    Applicability of ICWA

The mother asserts, for the first time on appeal, that the Department erred in finding that there was "no reason to know" that E.Z.-M. was an "Indian child." See 25 U.S.C. §1911.

Congress enacted ICWA in 1978 to "'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'"[3] T.L.G., 126 Wn. App. at 186-87 (quoting 25 U.S.C. § 1902).  ICWA grants tribes significant rights, including the right to intervene in state court proceedings involving termination of parental rights of an "Indian child."  Id. at 187 (citing 25 U.S.C. § 1911(c)).  An "Indian child" is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a

---

[3] In 2011 Washington enacted its own version of ICWA, the Washington Indian Child Welfare Act (WICWA), chapter 13.38 RCW.  LAWS OF 2011, ch. 309, § 3. We apply the provisions of ICWA and WICWA coextensively unless one provides more protection than the other, in which case we apply the more protective act. In re Welfare of A.L.C., 8 Wn. App. 2d 864, 872-73, 439 P.3d 694 (2019).  The focus of the mother's argument in this appeal is the applicability of ICWA.

member of an Indian tribe. 25 U.S.C. § 1903(4). If the Department or the court "knows or has reason to know that an Indian child is involved," it must send notice to the child's tribe or to the Bureau of Indian Affairs if the tribe's precise identity or location cannot be determined. 25 U.S. §1912(a); In re Dependency of J.A.F., 168 Wn. App. 653, 665-66, 278 P.3d 673 (2012); In re Matter of D.J.S., 12 Wn. App. 2d 1, 26, 456 P.3d 820 (2020).

Federal regulations outline the following six circumstances that provide a "reason to know" a child is an Indian child for purposes of ICWA:

> (1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;
>
> (2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;
>
> (3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;
>
> (4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;
>
> (5) The court is informed that the child is or has been a ward of a Tribal court; or
>
> (6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe.

25 C.F.R. § 23.107(c).

The mother challenges the juvenile court's finding because, although the court found there was "not a reason to know that the child is an Indian child," the

8

court did not use the blank lines underneath that preprinted finding to set forth the factual basis for its determination.

But, the court's factual finding that there was "no reason to know" that E.Z.-M. was an Indian child supports its legal conclusion that ICWA did not apply to the proceeding. And, substantial evidence in the record supports the court's finding that there was not a reason to know.

During the dependency proceedings that spanned more than six years, neither the mother nor any other participant argued or claimed that E.Z.-M. is an "Indian child" or has any relationship to an Indian Tribe. The August 2013 shelter care hearing order provides that "[t]he mother reports not having Native American ancestry" and that E.Z.-M.'s father had not been questioned on the matter.

In the January 2014 orders of dependency for E.Z.-M. and six of his siblings, the court found that (1) the Department had made a "good faith effort" to determine whether the children were Indian children and (2) "[n]one of the children have Native American heritage." Based on these findings, the court determined that ICWA did not apply. In a series of orders following dependency review hearings that occurred between 2014 and 2017, the court determined, based on prior findings and orders, that the dependent children were not Indian children. And, in several orders following dependency review hearings that occurred in 2018 and 2019, the court indicated that it specifically asked "each participant on the record whether the participant knows or has reason to know the child is an Indian child." No party challenged any of these prior orders.

9

In its April 2019 amended petition to terminate the mother's parental rights, the Department alleged that "[E.Z.-M.] is neither registered nor eligible for enrollment. There is no reason to believe the child is a member or eligible member of any federally recognized tribe." In her answer to the petition, the mother admitted to the accuracy of these facts.

Despite her admissions that she has no Native American heritage and that E.Z.-M. is not an Indian child, the mother argues that the court's finding is unsupported because there is no evidence that the Department investigated E.Z.-M's father's background. She claims that the father, who was incarcerated at the time of the dependency order and then deported to Mexico in 2015, did not participate in the proceedings. The mother points out that neither the father nor his attorney was present at the dependency review hearings during which the record indicates that the court specifically inquired about Native American ancestry. The mother asserts that the social worker's testimony that the Department had no reason to know that E.Z.-M. has Native American heritage was not dispositive. This is so, she claims, because the social worker did not describe the Department's investigation or any discussions with the father.

The mother's argument is not persuasive. First, contrary to her claim, the father initially participated in the proceedings, through his attorney. He contested the dependency. And, as explained, in the order of dependency as to the father, the court found that the Department made a good faith effort to determine the children's Indian status and that none of the children have Native American heritage. Second, as a general matter, the mother cannot establish a reason to

know by pointing to the absence of evidence. There is nothing in the federal or state statute that requires the court to make findings about the Department's investigation. And, third, to the extent the mother suggests that the record is not clear as to whether or not the father might have Native American heritage, the order terminating the father's parental rights states that "[t]he mother and father have . . . provided no further information to suggest the child may have Indian ancestry."

The mother fails to demonstrate that the Department had a reason to know that E.Z-M. was an Indian child. And, in the absence of any proof or claim that he is an Indian child, the mother's request for "conditional reversal and remand" to determine his Indian status is not warranted.

## III.  Provision of Necessary Services

The mother contends that the Department failed to meet its burden under RCW 13.34.180(1)(d) by failing to offer services to help her meet E.Z.-M.'s individual needs. She maintains that the court terminated her parental rights because E.Z.-M. lacked confidence in her ability to meet his unique needs. At the same time, she claims the Department provided no services to enable her to understand and address those needs, particularly as they relate to anxiety and attention deficit hyperactivity disorder (ADHD).[4]

When a condition precludes reunification, the Department must provide the necessary services to address that condition. In re Parental Rights to K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016). The services offered must be

---

[4] According to the record, E.Z.-M. takes medication for ADHD.

specifically tailored to the parent's unique needs. T.R., 108 Wn. App. at 161. Contrary to the mother's argument, the condition that precluded reunification was the "lack of parent child bond," not the mother's inadequate knowledge, parenting skills, or inability to "manage [E.Z.-M.'s] anxiety."

According to the evidence, rather than suffering from anxiety in general, E.Z.-M. had acute anxiety stemming from the uncertainty of the prolonged dependency process and the threat of being forcibly reunited with his mother. The court's unchallenged findings state that E.Z.-M. "has anxiety that is directly related to his fear of returning to his mother's care and lack of resolution of the dependency proceedings." The court also found that the "only way for [E.Z.-M.'s] anxiety to resolve is for his mother's rights to be terminated as soon as possible." In other words, it was not the mother's inability to address E.Z.-M.'s anxiety or ADHD that eroded the parent-child bond and caused him to resist contact and reunification. It was the potential of being forced to reunite with his mother, with whom he felt no connection, that led to his "constant anxiety."

According to other unchallenged findings, the parent-child bond deteriorated over time, partly because, although the dispositional order allowed her six hours of weekly visitation with E.Z.-M., the mother's visitation was initially "inconsistent." Sometimes, she visited weekly, but other times there were long intervals between her visits. And, when the visits did occur, they were "chaotic" or the mother was not focused on reconnecting with E.Z-M. Eventually, when E.Z.-M. no longer wished participate in visits, his mother used tactics that put pressure on E.Z.-M. that further alienated him.

The court found that E.Z.-M. "does not feel as though he matters to his mother, but rather that he is just one in a very large number."[5]  As an example, the court cited a rare instance when E.Z.-M. visited his mother and siblings at his mother's home and his mother did not respond to his requests to return to his foster home, despite his "obvious discomfort."  This experience reinforced E.Z.-M.'s belief that his mother "does not regard him as an individual, and is not interested in his needs."

The mother maintains that the circumstances here are analogous to those in In re Welfare of C.S., 168 Wn.2d 51, 225 P.3d 953 (2010).  In C.S., the mother's only identified parental deficiency was substance abuse. Id., at 53-54.  She corrected that deficiency and was sober for a year before a termination petition was filed.  Id. at 54.  Nevertheless, because the child had been diagnosed with behavioral disorders that made him difficult to manage, the trial court found the mother lacked the necessary "'patience, presence of mind, skills, experience, time in a day, and availability'" to adequately care for him.  Id. at 55. On that basis, the court terminated her parental rights.  Id.

The child's foster parent, who had also experienced difficulty in managing C.S., had been provided with training on how to better manage his behavior.  Id. at 55-56.  The Supreme Court reversed the termination order, holding that by

---

[5] Although the mother assigns error to this finding, in her argument and analysis she does not discuss any evidence supporting any particular finding of fact.  Assignments of error that are not argued in the brief are deemed to have been abandoned.  Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

failing to offer the same training to the mother, the Department failed to provide her with all appropriate and necessary services. Id. at 56.

The facts here are materially different from those in C.S. There is no evidence to indicate that parental coaching or instruction related to anxiety or ADHD would have remedied the lack of parent-child bond, which was the condition that precluded reunification. Substantial evidence supports the court's finding that the Department satisfied its burden to provide necessary and reasonably available services under RCW 13.34.180(1)(d).

Affirmed.

Appelwick, J.

WE CONCUR:

14